OGLETHORPE POWER CORPORATION, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE Oglethorpe Power Corp. v. Commissioner
Docket Nos. 37767-86, 2873-88, 3690-88
United States Tax Court
T.C. Memo 1990-505; 1990 Tax Ct. Memo LEXIS 558; 60 T.C.M. (CCH) 850; T.C.M. (RIA) 90505; September 24, 1990, Filed J. D. Fleming, Jr., N. Jerold Cohen and Reginald J. Clark, for the petitioners. Robert J. Kastl, for the respondent. DAWSON, Judge. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION In these consolidated cases respondent determined deficiencies in and additions to the Federal income taxes of petitioners as follows: Oglethorp Power Corporation
Taxable Year
Additions to Tax
Ended
Deficiency
Sec. 6653(b) [2]
Sec. 6653(b)(1)
Sec. 6653(b)(2)
Dec. 31, 1980
$  4,808,910
$ 2,404,455
Dec. 31, 1981
3,787,752
1,893,876
Dec. 31, 1982
11,112,718
$  5,556,359
*
Dec. 31, 1983
1,216,889
10,608,445
*
*560 Rollins, Inc. & Subsidiaries
Taxable Year Ended
Deficiency
June 30, 1979
$ 13,725,643
June 30, 1980
560,406
June 30, 1982
8,370,693
June 30, 1983
9,971,412
National Service Industries, Inc.
Taxable Year Ended
Deficiency
August 31, 1976
$    244,507
August 31, 1979
13,536,008
August 31, 1980
2,440,859
August 31, 1982
24,754,379
August 31, 1983
17,938,968
August 31, 1984
17,077,739
The controversy presently before us involves Plant Scherer Unit One, a large coal-fired electrical generating plant which was the subject of safe harbor leases entered into between petitioner Oglethorpe Power Corporation and petitioners Rollins, Inc., and National Service Industries, Inc. By agreement of the parties and pursuant to the Court's Order of April 16, 1990, the trial held from May 14 through May 17, 1990, was limited to a single issue: The date on which Plant Scherer Unit One was placed in service. A decision as to that date directly affects the validity of the safe harbor leases under section 168(f)(8), which were executed by petitioners on April 9, 1982, for the purpose of transferring the tax benefits attributable to Oglethorpe's *561 60-percent ownership interest to Rollins, Inc., and National Service Industries, Inc. For property to be deemed "qualified leased property" under the provisions of section 168(f)(8)(D)(ii), it must have been leased within 3 months after such property was placed in service. Thus the critical issue we must decide is whether Plant Scherer Unit One was placed in service on March 19, 1982, as petitioners contend, or on November 28, 1981, as respondent contends. A substantial number of related issues will depend upon the resolution of the "placed in service" issue. FINDINGS OF FACT Some of the facts are stipulated and are so found. The stipulations of facts and accompanying exhibits are incorporated herein by this reference. The facts necessary for the resolution of the disputed issue are set forth below. At the time the petitions were filed in these cases Oglethorpe Power Corporation had its principal place of business in Tucker, Georgia; and Rollins, Inc., and National Service Industries, Inc., had their principal places of business in Atlanta, Georgia. Description of Oglethorr Power Corporation, Georgia Power and Plant Scherer Unit One
Ogelthorpe Power Corporation *562 (Oglethorpe) is a cooperative formed by 39 local, consumer-owned electric membership corporations which serve approximately 71 percent of the land area in Georgia. It was organized in August 1974, to develop generating plants and transmission systems to meet the power needs of its 39 cooperative members. Georgia Power Company (Georgia Power) is a wholly owned subsidiary of The Southern Company, a publicly held utility holding company. In September 1974, Georgia Power began construction of a new coal-fired electric power generating plant known as Plant Robert W. Scherer. Four generating units were to be constructed. It was expected that construction of the first unit would take about 6 years. Plant Scherer is located on a 12,000-acre site near the Ocmulgee River about 10 miles east of Forsyth, Georgia, and about 17 miles north of Macon. It is served by a 3,600-acre lake, created on the site for such purpose. In May 1980, Oglethorpe purchased from Georgia Power an undivided 60-percent interest in Scherer Unit One, the first generating unit to be constructed. Oglethorpe paid Georgia Power 60 percent of the construction cost and agreed to pay 60 percent of all future construction *563 costs and capital costs. Scherer Unit One was the subject of lease transactions between Oglethorpe and Rollins, Inc., and National Service Industries, Inc., involving all of Oglethorpe's percentage interests. Pursuant to section 168(f)(8) of the Code, the parties elected to treat the leases, known as safe harbor leases, as leases for Federal income tax purposes only. Both transactions were closed on April 9, 1982. Each of the four generating units at Plant Scherer was intended to have a generation output of 818 megawatts and each was to consist of, among other items, a boiler, a turbine-generator, a condenser, a cooling tower, a smokestack (shared by two units), a precipitator, electrical switching equipment, and a source of water and fuel. The Scherer Unit One boiler is 100 feet wide, 47 feet deep, and 250 feet high. Two sheets of canvas, each the size of a football field, would just wrap around the boiler. The smokestack serving Scherer Unit One was constructed of concrete, poured-in-place and steel lined, and is 1,000 feet high, approximately the height of the Chrysler Building in New York City. The turbine-generator for Scherer Unit One is approximately the length of *564 a football field. The natural draft cooling tower for Scherer Unit One, also constructed of poured-in-place concrete, is 530 feet tall and 400 feet in diameter. Twenty-five Washington Monuments would fit inside the cooling tower. Because of its financial difficulties Georgia Power, between August 1976 and May 1980, sold ownership interests in Scherer Unit One as follows: Ownership
Owner
Interest
Olgethorpe
60 percent
Municipal Electric
Authority of Georgia
(MEAG)
30.2 percent
City of Dalton
(Dalton)
1.4 percent
Georgia Power retained an 8.4-percent ownership interest. Oglethorpe, MEAG and Dalton appointed Georgia Power their agent in connection with Scherer Unit One to act on their behalf in the planning, design, licensing, acquisition, construction, completion, renewal, addition, replacement, modification and disposal thereof. Georgia Power had sole authority and responsibility for the planning, licensing, design, construction, acquisition, completion, renewal, addition, replacement, modification and disposal of Scherer Unit One. Georgia Power was authorized, in the name and on behalf of itself and the other co-owners, to take all reasonable *565 actions which, in the discretion and judgment of Georgia Power, were deemed necessary or advisable to effect the planning, licensing, design, construction, acquisition, completion, renewal, addition, replacement, modification and disposal of Scherer Unit One. The Ownership Agreement executed by the parties provided that, in the event Scherer Unit One or any portion thereof should be damaged or destroyed and the cost of repairs or reconstruction is estimated to be more than the aggregate amount of insurance coverage, then, if the co-owners determine to repair or reconstruct the unit, Georgia Power would cause such repairs or reconstruction to be made, and the co-owners would share the costs of such repairs or reconstruction in excess of available insurance proceeds in proportion to their respective undivided ownership interests. The Ownership Agreement also provided that Georgia Power, during the construction of Scherer Unit One, would carry in the name of the co-owners, in proportion to their respective undivided ownership interests in the unit, builder's risk or installation floater insurance of the "all risks" type in an amount and including such risks as is consistent with Georgia *566 Power's customary practices and in accordance with prudent utility practice. The co-owners of Scherer Unit One also had a member on the construction committee. Georgia Power was in charge of the construction of Scherer Unit One. The boiler was built by Combustion Engineering, Inc. The smokestacks were constructed by Chicago Bridge and Iron. The turbine-generators were supplied by General Electric. Design of Scherer Unit One
An electric generating unit is a very complex piece of machinery. It takes years to design a large electrical generating plant, construct the plant, and obtain the permits and approvals necessary for its operation. While the construction of Scherer Unit One began in 1974, it was not completed for 7 years. The major components of a generating unit, and Scherer Unit One in particular as stipulated by the parties, are as follows: A. Boiler and associated furnace - In the case of Plant Scherer Unit One, this apparatus is 100 feet wide, 47 feet deep and 250 feet high, as high as a 25 story building. It is able to produce 5,790,000 pounds of steam every hour at 2500 pounds per square inch pressure and 1000 degrees Fahrenheit of temperature. At *567 full load, the furnace burns 322 tons of coal every hour. A.1 Superheater section of the boiler - After steam is produced in the boiler, it passes through tubes in the superheater section. In these tubes, the steam is heated by combustion gasses from the furnace area to 1000 degrees Fahrenheit at 2500 pounds per square inch pressure. The steam passes from the superheater to the turbines. A.2 Economizer section of the boiler - Just before existing to go to the stack, the combustion gasses pass over tubes in the economizer section of the boiler through which feed water flows and is heated before it is fed to the main boiler tubes. B. Steam Turbine-Generator - The steam from the boiler drives a turbine which is coupled to an electric generator for the generation of electricity. The steam turbine-generator is about the length of a footfall field and rotates at 3600 revolutions per minute. C. Condenser - The exhaust steam from the steam turbine-generator passes through the condenser where it is condensed into water. D. Boiler feed pumps - These pump the steam condensate back into the high pressure boiler, completing the cycle. E. Cooling tower *568 - Natural draft towers for disposing of the heat removed from the steam by the condenser. The cooling tower is a poured concrete structure 530 feet tall and 400 feet in diameter. F. Fuel conveyor system - Moves the coal from the coal storage pile area to the coal pulverizers. G. Pulverizers - These grind the coal into a power as fine as talcum powder, from which the powdered coal is blown (by a pneumatic system) into the furnace. H. Smokestack - A poured concrete structure 1000 feet tall and 88 feet in diameter (at the base) which provides support for the 2 internal, actual smokestacks which are stainless steel pipes connected individually to Units 1 and 2. I. Precipitator - A device to remove electrostatically the fly ash and other particles resulting from the combustion process. J. Control equipment - A complex arrangement of sensing, computing, measuring and signally equipment for operating the plant. Georgia Integrated Transmission System
The generating plants in which Oglethorpe has an interest, including Plant Scherer, are part of the Georgia Integrated Transmission System. This is a system of transmission lines and substations jointly *569 owned by the major power suppliers in the State of Georgia. Plants within the Georgia Integrated Transmission System are controlled by a central dispatch office locatedin Birmingham, Alabama. There the dispatcher continuously monitors the load demands of the system and calls for the operation of individual plants as needed. Energy from the plants in the system is transmitted to the system on the basis of economic dispatch, a process in which the plants having the lowest variable costs are called upon first, and then the next lowest, and so forth. The plants that are the least expensive to operate are designated as "base" plants, the next most expensive as "intermediate" plants, the next as "peaking" plants, and, finally, the most expensive plants to operate are the "reserve" plants. Plant Scherer was designed so that initially it would be used to satisfy peak load demand, and eventually would become an intermediate load plant, operating on a 12 to 18 hour per day schedule. However, the need to use low sulfur coal in order to meet the requirements of the Clean Air Act made Plant Scherer's energy more expensive than other available energy and ultimately resulted in it being designated *570 as a "reserve" plant in the integrated transmission system. Testing of Scherer Unit One
The major components of Scherer Unit One were separately tested to the extent possible to eliminate problems which could be detected prior to the time the unit was first connected to the integrated transmission system. However, to test fully the major components of an electric generating unit they must be assembled into an integrated unit so that the unit can be operated near its design level of energy production. Testing the integrated unit is essential before the unit will be accepted for normal system dispatching and before the unit will be considered by the Georgia Public Service Commission for rate making purposes. The test period is necessary in order to establish the operational readiness of the unit. Since electric energy cannot be produced unless it is simultaneously consumed, testing the ability of an electric generating unit to operate as an integrated facility requires that the unit be synchronized with the transmission system so that the unit can be operated under a load. Synchronization of the generating unit to the integrated transmission system requires that the frequency *571 and voltage of the unit be matched to those of the system. Synchronization is the state where alternating current systems, generating units, or a combination are connected in parallel and operate at the same frequency and where the phase angle displacements between voltages in them are essentially constant. Scherer Unit One was first synchronized with the Georgia Integrated Transmission System at 12:12 p.m. CST on November 28, 1981. When a unit is synchronized, the generator voltage output of the unit must be exactly the same as the voltage of the system or there will be tremendous stress on the generator and the turbine. Before the moment of initial synchronization, there is a series of physical activities that take place in the power plant that have to be brought into combination and conjunction before that facility is finally connected or synchronized to the system. The steps leading to synchronization are done for the first time in coordination, and there are little delays in the various activities, or the various individual activities cannot quite keep up with a predetermined schedule so that, as they do come together and are brought together by the chief operator, at that *572 moment when everything is ready, he closes the switch. Between the transmission system and a unit is the equivalent of an electrical switch called a circuit breaker. That switch is in an open position so that there is no connection between the power plant and the system until the moment of synchronization when the switch is closed so that the power plant becomes part of the system. "Commercial operation" refers to the status of an electric generating plant which is available to the system dispatchers, as contrasted to a new plant which is still being constructed and tested to achieve that status. Georgia Power's on-site engineers declared Scherer Unit One in "commercial operation" when it demonstrated its ability to operate at its design load on a continuous basis as needed. Until Scherer Unit One was declared in "commercial operation", it could not be released for system dispatch in the Georgia Integrated Transmission System. The period between initial synchronization and the time at which the unit achieves "commercial operation" status is referred to as the "test period." During the test period the components of the unit are integrated into a coordinated system, problems *573 are identified which prevent the system from operating as intended, solutions are implemented, and the unit is moved from the testing to commercial operation state of readiness. After the initial synchronization and the beginning of testing, a series of operational problems was found to exist in Scherer Unit One. Between November 28, 1981, and December 12, 1981, the unit was able to operate only intermittently because shutdowns were required to repair turbine vibrations, a steam leak and leaks in the pneumatic coal lines. Peak power output during that period did not exceed 360 megawatts, less than half of the design output level of 818 megawatts. On December 13, 1981, the unit was restarted and was operated continuously through December 16 before being forced down again on December 17 because of a cooling tower leak. During that period of operation the unit exceeded 400 megawatts for the first time. Between output levels of 500 and 600 megawatts, strong sonic vibrations began to occur in the backpass or economizer section of the boiler. The economizer section of the boiler contains in excess of eight thousand horizontal lengths of connected steel tubing through which water *574 passes before being fed to the furnace section of the boiler. The exhaust gasses from the furnace pass over these tubes at high speeds, heating the feed water inside the tube. As the exhaust gasses pass over the tubes, small whirlpools or "vortices" are formed downstream, behind the tubes. These vortices are alternately created and then released further downstream in the gas flow, a phenomenon called "vortex shedding." The resulting pressure fluctuations within the economizer can generate sound waves which, depending on factors such as temperature, gas flow rates and the dimensions of the economizer chamber, will at certain frequencies "lock in" to the chamber's natural resonating characteristics and produce sonic vibrations. In some instances these vibrations can be intense. When sonic vibrations were encountered, Combustion Engineering began making preliminary measurements in order to determine the cause of the problem and provide a solution. The sonic vibrations in Scherer Unit One were unusual because two different wave patterns and two different frequencies were encountered. The unit remained shutdown from December 17 through December 21 while a cooling tower leak was *575 repaired and pulverizer maintenance was performed. Following restart and during testing in late December 1981, hot fly ash was seen leaking from the large ash hoppers immediately beneath and connected to the economizer section of the boiler. These ash hoppers are designed to collect small particles of ash that have passed through the boiler before the exhaust gasses go on to the precipitators and up through the smokestack. On December 29, 1981, when an oil leak in the power transformer interrupted testing and forced a shutdown of the unit, the economizer ash hoppers were opened. Welds connecting several angle-iron bars into the hoppers were found to have been broken and the sides of the hoppers had split, creating six to eight foot cracks. Ronald Crump, who was Combustion Engineering's Assistant Project Manager and then Project Manager at Plant Scherer, initially thought that the cracks were due to poor welding and not to the sonic vibrations. He later concluded that the damage was caused by the sonic vibrations. After the unit was taken off line on December 29, 1981, support rod anchors began to pull out of the concrete wall of the 1,000-foot-high smokestack as it cooled. *576 At the 950-foot elevation, a guide sheared off its top connection and a stay-rod anchor separated from the concrete. These failures tore large slabs of concrete from the internal wall of the stack, leaving a hole approximately eight feet square, and six to eight inches deep in the center. The slabs of concrete fell, damaging catwalks, junction boxes and other items on the inside of the stack. At the same time another stay rod became overstressed and created a one-inch deep crack in the concrete wall running vertically upward. Other beams began bending and twisting at the 950-foot elevation, and beams at lower levels also showed signs of overstressing. Repair of the failures in the stack support system required two weeks to complete. During the repairs Scherer Unit One could not be operated and remained off line until January 16, 1982. Following the shutdown for repair of the smokestack, Scherer Unit One was restarted on January 16, 1982, when it was operated for the first time for a full 24 hours in the range of its rated capacity of 818 megawatts. During this operation the sonic vibrations in the economizer section of the boiler intensified, causing further damage to the *577 ash hoppers. Because of continued reports of the severity of the sonic vibrations at Scherer Unit One and the recurrence of cracking in the economizer ash hoppers, Mr. Crump of Combustion Engineering visited the unit on January 18 and 19, 1982, and observed the severe vibrations. Because of the intensity of the sonic vibrations, Combustion Engineering then instructed Georgia Power if possible to avoid operating the unit at power levels which would cause the sonic vibrations to occur. Raymond F. Hickey, a section manager in performance design at Combustion Engineering in late 1981 and early 1982, and a witness for respondent in this case, had never before and has not since encountered a sonic vibration problem in a coal-fired boiler constructed by Combustion Engineering that was as severe or as persistent as the vibration problem at Scherer Unit One. When Scherer Unit One was under construction, the incidence of sonic vibrations in coal-fired units was rare. Combustion Engineering would have predicted that sonic vibrations were very unlikely to occur in the unit. Combustion Engineering initially had expected that the sonic vibrations would disappear as ash deposits built up *578 on the tubes in the backpass of the boiler. At the time of his visit to the site on January 18 and 19, 1982, however, it became apparent to Mr. Crump that the sonics would not be eliminated by ashing. He also concluded that the damage to the ash hoppers was definitely caused by the sonic vibration. For these reasons Combustion Engineering decided that it was imperative to install baffles in order to bring the sonic vibrations under control. Baffling is one means of preventing sonic vibrations. This consists of inserting metal plates into the gas flow path to alter the flow pattern and chamber dimensions and thereby prevent the formation of reinforced sound waves. Coal-fired boilers are not prebaffled because it is difficult to predict the likelihood of a vibration problem or the location and frequency of the sound waves if they do occur. As a result, until the problem occurs and measurements can be made, there would be a risk of putting the baffles in the wrong place. Furthermore, baffles create maintenance problems and hinder inspections within the boiler. Baffles are also expensive. A shutdown of Scherer Unit One was scheduled beginning on January 30, 1982, so that the turbine *579 screens could be removed. When the screens were removed, an antirotation pin in one of the mainturbine stop valves was found to have broken off. Because of the very high rotational speed of the turbine blades, the loose metal pin could cause a catastrophic failure of the turbine if it passed through the steam path and hit the blades. It was thus essential to locate and remove the pin before the unit could be operated again. From February 4 to February 6, General Electric and Georgia Power attempted to locate the pin using a specially insulated fiberoptic television camera. General Electric disassembled the high pressure section of the turbine to access the upper nozzle block. The high pressure rotor was then removed to investigate the lower nozzle block and the pin was finally found on February 9, 1981. The turbine valve was reassembled on February 9 through February 11. While the unit was off-line between January 30 and February 14, 1982, Combustion Engineering worked overtime to install sidewall baffles angled along the inside walls of the economizer in an attempt to eliminate the sonic vibration problem. However, when the unit was restarted on February 14, 1982, the vibration *580 problem was still present if the unit was operated in excess of about 500 megawatts output. Combustion Engineering immediately began working overtime to fabricate and install a second set of baffles to hang vertically and parallel to the boiler walls within the economizer section. Double drivers were set up for trucks to deliver materials to the site, and the installation process was conducted on an around-the-clock basis. When the material for the parallel baffles arrived at the site, a shutdown began on February 28, 1982, so that the sidewall baffles could be removed and the new baffles could be installed. The cost to Combustion Engineering was $ 594,893. On March 11, 1982, the unit was restarted and it was determined that the vibration problem had been solved. Scherer Unit One ran without vibrations at various output levels from March 11 to March 19, 1990, when Georgia Power declared it in commercial operation. On March 17 and 18, 1982, compliance testing was carried out to meet the requirements of the Georgia Environmental Protection Division for applying for a Permit to Operate a Facility that is a Stationary Source of Air Contamination. Application for this permit *581 was required to be filed within 30 days of commencement of normal operation. The permit application was filed on March 23, 1982, and the permit was issued on November 16, 1982. Following commercial operation, additional testing remained to be completed for fine-tuning and warranty purposes, although Georgia Power believed that sufficient testing had been completed to declare the unit in commercial operation. Test Period Energy
Power generated during the test period is erratic and not subject to scheduling. When it is fed into the distribution system, it is necessary to withhold an equivalent amount of power which would otherwise be generated by plants already available for normal system dispatch. In accord with the Ownership Agreement of Oglethorpe and the other co-owners, Georgia Power determined when Scherer Unit One would be operated during the test period, retained all of the energy produced by the unit during the test period, and bore all of the fuel and operating and maintenance costs associated with the production of that energy. This same arrangement had been in effect in connection with two other jointly owned plants which had been previously constructed, i. *582 e., Plant Hatch and Plant Wansley. The variable costs (primarily fuel costs) of Scherer Unit One were much higher than those of any other coal-fired plant in the Georgia Integrated Transmission System, and the test period energy merely displaced energy from other lower variable cost units. During the test period from November 28, 1981, through March 18, 1982, Georgia Power received revenues from sales of electrical power produced by Scherer Unit One and incurred expenses attributable to such revenues, as follows: 1981
1982
Total
Revenues
$ 5,546,341
$  8,319,513
$ 13,865,854
Expenses
5,200,987
14,790,655
19,991,642
Thus the generation and transmission of the test period energy resulted in an economic loss to Georgia Power of over $ 6 million. Availability of Scherer Unit One to Produce Income For Oglethorpe
Oglethorpe purchased its interest in Scherer Unit One to augment the total energy available to it at the least possible cost. Scherer Unit One was constructed for the purpose of providing its rated capacity for the Georgia Integrated Transmission System and to provide energy to that system when called upon to do so. *583 Under the Operating Agreement, Oglethorpe agreed to transfer to Georgia Power a decreasing portion of its capacity and energy from Scherer Unit One during the first ten years of the unit's commercial operation. In exchange, Georgia Power agreed to begin making payments to Oglethorpe under the Agreement at the time that Scherer Unit One was declared in commercial operation. Oglethorpe had no right to, and did not derive, any income from Scherer Unit One until the date the plant was declared in commercial operation. In accordance with its past practices, Georgia Power began depreciating its interest in Scherer Unit One on the date of initial synchronization, November 28, 1981, for purposes of Federal and State income taxes. However, until the unit was declared in commercial operation, Georgia Power did not begin depreciating its interest in the unit for purposes of its financial statements, reports to its creditors and its shareholders, filing with the Securities and Exchange Commission, filings with Federal Energy Regulatory Commissioner (FERC), or filing with the Georgia Public Service Commission. Scherer Unit One was declared available for commercial use and to the system *584 dispatcher for economic dispatch on March 19, 1982. Oglethorpe then became entitled to its share of the capacity and energy of the unit and became responsible for its portion of the operation and maintenance costs of the unit. Prior to that time the operation and maintenance costs were capitalized by Georgia Power as part of the expenses of construction, and the cost of the funds used during construction was capitalized as a part of the construction costs. Until commercial operation, an electric generating plant is not available for system dispatch, which is the purpose for which the plant has been constructed. It therefore cannot become a part of the utility's rate base prior to that time. The test for placing a plant in the rate base in Georgia, as it is in most other jurisdictions, is whether the plant is used and useful. This is the time when it is available to the utility for the function for which it has been constructed. At the time of commercial operation, Scherer Unit One was transferred from Georgia Power's construction group, which was responsible for constructing and testing the unit, to its operations group, which was responsible for operating the unit. Pursuant *585 to its regular accounting practice, Oglethorpe treated Scherer Unit One as being placed in service as of March 19, 1982, the date on which the unit first became available to produce income for Oglethorpe. Oglethorpe first received income from Scherer Unit One at the commencement of sales under the buyback Agreement with Georgia Power, which began at commercial operation, as defined in the Agreement. With respect to Scherer Unit One, for purposes of preparing its annual reports and reports to its members, to the Rural Electric Authority (REA) and to the Internal Revenue Service, Oglethorpe followed its regular accounting practice for determining the placed in service date of the generating units in which it had an interest. This regular practice was to acknowledge that the unit was placed in service on the date of commercial operation. Oglethorpe's outside auditor, Arthur Andersen & Company, approved financial reports based upon this practice as being in accordance with generally accepted accounting principles, and the REA has accepted reports based upon this practice as being in accordance with the principles required by the REA for rural electric cooperatives. The accounting *586 procedures which must be followed during the test period are determined by the FERC and Georgia Public Service Commission. FERC requires that major utilities furnish it with full particulars of and justification for any test period which extends beyond 90 days following initial synchronization for a coal-fired plant. Since commercial operation did not occur within 90 days of synchronization, as required by FERC, the required explanation was given as to the reasons for the delay in reaching commercial operation status. The explanation indicated that the sonic vibration problems prevented commercial operation from being achieved within the 90-day period. Control of Scherer Unit One During Construction
Under the agreements between Georgia Power and the other co-owners of Scherer Unit One, Georgia Power had sole and exclusive authority and responsibility for the construction of the unit. Although the other co-owners each had a member on the construction committee, Georgia Power had the right to undertake all construction activities deemed necessary or advisable in its discretion and judgment. Not until Scherer Unit One was declared in commercial operation did the co-owners *587 other than Georgia Power have control over the operation of the plant. At that time the other co-owners first became entitled to their percentage of the capacity and energy and first became responsible for their respective shares of the fuel and operation and maintenance costs of the unit. Effect of Vibration on Personnel
Noise measurements in terms of decibels can be made on a number of scales, including the A, B and C scales, and a linear scale. The scale is determined by the nature of the filter which is attached to the sound level meter at the time the measurements are taken. The filters are designed according to internationally accepted criteria, and measurements taken in one scale can be converted to another scale. The noise on a busy street, measured on the A scale, could be up to approximately 80 decibels. For example, 8OdB(A) represents a level of 80 decibels on the A scale. The noise level of rock concerts is commonly between 90 and 100 dB(A). The noise level of a jackhammer would be approximately 110 dB(A). As the noise level increases by ten dB(A) the noise will be perceived as twice as loud. However, the energy of the sound wave doubles every time *588 there is an increase of three. Bernard C. Postlethwaite, an acoustical engineering expert, examined the noise level measurements made at Scherer Unit One by Combustion Engineering in December 1981 and January 1982. The measurements showed an increase in noise level as the unit load was increased. The instruments used by Combustion Engineering for its measurements of noise levels inside the economizer section of the boiler could not measure noise levels in excess of 150 dB (linear). Mr. Postlethwaite estimated that the noise levels inside the boiler were of the order of 160 dB (linear) when the unit was being operated at a 710 megawatts level. The average noise level on the walkways outside the economizer section of the Scherer Unit One boiler was about 145 dB (linear) when the unit was being operated at generation levels between 170 and 770 megawatts. This converts to 114 dB(A), the equivalet of more than twice as much sound energy as would be emitted from an unshielded jackhammer. The frequency of the noise waves emitted from a jackhammer would be in the range of 500 to 2,000 cycles per second (500 to 2,000 Hertz). In contrast, the two frequencies being emitted from the *589 Scherer Unit One boiler were about 43-45 Hertz and 65 to 67 Hertz. Since human body cavities resonate at low frequencies, a low frequency sound affects the body much more severely than a high frequency sound. An individual exposed to a low frequency sound of 45 Hertz at a sound level of 114 dB(A) would find that his chest was vibrating, that he was becoming nauseous and that he was having difficulty seeing. The low frequency vibrations outside the economizer section of the Scherer Unit One boiler were generated at peak levels of 118-119 dB(A) and an average level of 114 dB(A). Mr. Crump of Combustion Engineering visited Scherer Unit One and experienced these vibrations. The sonic vibrations were so strong that people could not be asked to work in the area for any length of time. The vibrations could be felt in the entire body and could make a person sick at his stomach. Al Rubin, who was project manager at Scherer Unit One prior to Mr. Crump, indicated that the sonic vibrations made a person sick at the stomach and caused his body to tremble so that he could not remain in the area very long. During the trial a demonstration was conducted of low frequency sound levels (44 *590 Hertz) at 125 dB (linear) or 90 dB(A) approximately one-fourth of the perceived noise level and one two-hundredth of the energy level of the sonic vibrations at Scherer Unit One. Mr. Crump described the sound in the demonstration as being very similar to that at Scherer Unit One, though not as intense. Mr. Postlethwaite indicated that even at the lower sound levels in the demonstration, his chest vibrated quite strongly and he began to feel a sense of gagging in his throat. A person could not tolerate the noise for more than about two minutes. Moreover , regulations of the Occupational Safety and Health Administration (OSHA) do not allow employees to be exposed to noise levels in excess of 115 dB(A) and allow only 15 minutes of exposure of an employee to 115 dB(A). The peak sound levels at the Scherer Unit One boiler were 118 to 119 dB(A). The OSHA regulations require vibrating equipment to be modified to lower the noise levels to 90 dB(A) and only after such modification is the employer permitted to rely upon protecting the employees with earmuffs, ear plugs, and the like. The chances of protecting employees from the noise level experienced at Scherer Unit One with hearing *591 protectors was almost nil. These protectors do not protect against low frequency noises, such as those experienced at Scherer Unit One. Effect of Vibrations on Equipment
When metal is bent back and forth over a period of time, it will break. This is called a fatigue failure. At the frequencies that were occurring at Scherer Unit One, the sonic vibrations would flex materials between one million and ten million cycles every two-to-three-day period. As a result of these vibrations, large cracks developed in the economizer ash hoppers and hot ash was released into the plant. Attempts to repair the ash hoppers were not successful until the sonic vibrations were eliminated. It was the opinion of Dr. Gene T. Colwell, a professor of mechanical engineering at the Georgia Institute of Technology and a registered professional engineer, that the ash hoppers were damaged by the sonic vibrations. Raymond Hickey, who was a section manager for Combustion Engineering at the time of construction of the Scherer Unit One boiler, indicated that the sonic vibrations in this unit were unusual in that they caused structural damage, cracking and splitting the economizer ash hoppers. Availability *592 of Scherer Unit One for Its Specifically Assigned Function
The assigned function for Scherer Unit One was to provide its rated capacity of 818 megawatts for the Georgia Integrated Transmission System and to provide energy for that system when called upon by the system dispatcher. Until a unit has been tested and determined to operate reliably, it cannot be declared in commercial operation and cannot be made available for system dispatch and utilization in the Georgia Integrated Transmission System. ULTIMATE FINDINGS OF FACT Scherer Unit One was not in a condition or state of readiness and available for its specifically assigned function until the installation of the second set of baffles by Combustion Engineering and the sonic vibration problems were corrected, at which time it was declared in commercial operation on a regular basis. Scherer Unit One was placed in service on March 19, 1982. OPINION These cases involve the issue of when a large electric generating plant was placed in service. The plant, Scherer Unit One, was the subject of separate safe harbor lease transactions between Oglethorpe and Rollins, Inc., and between Oglethorpe and National Service Industries, *593 Inc. Respondent's position is that the safe harbor leases were not valid because they were not entered into within three months after the date on which Scherer Unit One was placed in service, as required by section 168(f)(8)(D)(ii) and section 5c.168(f)(8)-6, Temporary Income Tax Regs., 46 Fed. Reg. 51910 (Oct. 23, 1981) and amended at 46 Fed. Reg. 56150 (Nov. 13, 1981) and 46 Fed. Reg. 63258 (Dec. 31, 1981). The lease transactions were closed on April 9, 1982, making January 8, 1982, the critical date for determining the validity of the safe harbor leases. If Scherer Unit One was placed in service after January 8, 1982, the safe harbor leases are valid. Respondent contends that Scherer Unit One was placed in service on November 28, 1981, when the unit was first synchronized with the Georgia Integrated Transmission System. To the contrary, Oglethorpe contends that the testing of Scherer Unit One, as a fully integrated unit, had not begun at the time of initial synchronization, and that the test period which followed synchronization revealed a series of major defects which made it impossible for the unit to *594 serve its intended purpose until the defects were corrected. Those problems were finally brought under control in March 1982, and Scherer Unit One was placed in service on March 19, 1982, when it was made available to Oglethorpe by Georgia Power declaring it in commercial operation. As reflected in our detailed findings of fact and our ultimate findings, we conclude that petitioners should prevail. Property may be depreciated for tax purposes only after it is "placed in service." Sec. 1.167(a)-10(b), Income Tax Regs. Under the now repealed investment tax credit provisions, an investment tax credit was allowable at the same time. Sec. 1.46-3(d)(1)(ii), Income Tax Regs. By using a leveraged lease, a taxpayer could transfer the depreciation deductions and investment tax credits relating to new property to another party and retain beneficial use of the property. Prior to the safe harbor leasing provisions contained in the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, a leveraged leasing transaction, which usually began with a sale and then a leaseback, had to be consummated before property was placed in service *595 or the purchaser-lessor would be depreciating used property and would not be entitled to any investment tax credit. Sec. 48(b). The safe harbor lease provision relaxed this requirement by validating a sale-leaseback entered into at any time within three months after the time the property was placed in service. Sec. 168(f)(8)(D)(ii). Since the term "placed in service" serves the same function for depreciation, investment tax credit and safe harbor lease purposes, the applicable Treasury Regulations governing depreciation, investment tax credits and safe harbor leases are similar. Section 1.167(a)-11(e)(1)(i), Income Tax Regs., relating to depreciation, provides: The term "first placed in service" refers to the time the property is first placed in service by the taxpayer, not to the first time the property is placed in service. Property is first placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity. * * * [Emphasis added.] Similarly, section 1.46-3(d)(1)(ii), Income Tax Regs. *596 , relating to the investment tax credit, provides: For purposes of the credit allowed by section 38, property shall be considered placed in service in * * * * * * (ii) The taxable year in which the property is placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity. [Emphasis added.] Section 5c.168(f)(8)-6(b)(2), Temporary Income Tax Regs., 46 Fed. Reg. 51911 (Oct. 23, 1981), relating to safe harbor leases, provides, in part, as follows: Property shall be considered as placed in service at the time the property is placed in a condition or state of readiness and availability for a specifically assigned function. * * * [Emphasis added.] By applying the provisions of the regulations to the facts here, it is our view that Scherer Unit One was not available for its specifically assigned function on November 28, 1981, when it was first synchronized into the Georgia Integrated Transmission System. The unit could only be tested as a fully assembled unit after *597 initial synchronization, and the major operational defects that were ultimately found to exist could not have been discovered without such testing. Until remedied the defects prevented Scherer Unit One from achieving generation levels near its rated capacity, the 818 megawatts output for which it was designed. Moreover, until the unit demonstrated the ability to achieve a consistent output near this level, Georgia Power, the construction contractor, could not declare it ready for commercial operation and deliver control of the unit to the operations group for system dispatch. Only then did Oglethorpe receive income from its interest in Scherer Unit One under its Agreement with Georgia Power. Respondent's expert witness regards an electric generating unit as "among the most complex pieces of machinery ever created" and conceded that testing of such a unit can only take place after synchronization. He also recognized that a test period is essential as a practical matter, and that for FERC reporting purposes the unit is only considered to be placed in service at the end of the test period when commercial operation is declared. Nonetheless, his opinion is that a plant should be deemed *598 placed in service for income tax purposes when it is first synchronized because a test based upon consideration of the facts related to the plant's ability to perform its intended function would be too difficult for the Internal Revenue Service to administer. Consequently, he would construct a rule of law that an electric generating plant is placed in service when it is first synchronized with its transmission system and begins producing some electricity even though it is only at that time that testing of the plant as an integrated unit can begin. The Internal Revenue Service, however, has not gone that far. From its published revenue rulingsinterpreting the "placed in service" regulations in the context of electric generating units, a number of factors can be identified as determining when a unit is placed in service. These factors include whether: 1. The necessary permits and licenses for operating have been obtained. 2. All critical tests necessary for proper operation have been performed. 3. The unit has been placed in the control of the taxpayer by the construction contractor. 4. The unit has been synchronized with the transmission grid. 5. Daily operation of *599 the unit has begun. See Rev. Rul. 79-98, 1979-1 C.B. 103; Rev. Rul. 76-428, 1976-2 C.B. 47; Rev. Rul. 76-256, 1976-2 C.B. 46. In view of the multiplicity of factors to be considered, it is clear that initial synchronization alone is not determinative of the "placed in service" date. Since the ability of an electric generating unit to operate on a regular basis cannot be demonstrated until after synchronization, a rigid "bright line" standard using only the initial synchronization date would, in our judgment, fail to take into consideration factors such as testing and daily operation which the Internal Revenue Service has identified as key in determining when a unit is placed in service. Such a determination requires the consideration and balancing of all the factors. In Rev. Rul. 79-98, supra, which is closest in time to entry of the safe harbor leases here in issue, the Service found that an electric generating plant was not placed in service at the time of initial synchronization and suggested that it would not be in service until its generation output had successfully reached its rated capacity. Some two years later *600 the Service indicated that reaching the design limits was not a prerequisite to a determination that a solid waste disposal plant was placed in service, but it did not suggest that initial synchronization was the only requirement. Rev. Rul. 84-85, 1984-1 C.B. 11. Instead, that ruling relied upon the fact that the plant was "being operated on a regular basis" in finding it to have been placed in service. It is also significant that in Consumers Power Co. v. Commissioner, 89 T.C. 710, 723-726 (1987), the Commissioner successfully contended that a hydroelectric generating plant was not placed in service in the year it was first synchronized because problems occurring after synchronization prevented the plant from being used on a consistent basis until the following year. That case involved a pumped storage plant constructed by the taxpayer and Detroit Edison Company, as joint owners, for the purpose of generating electric power to be made available to the Michigan Power Pool, an association of Michigan public utility companies of which the taxpayer was a member. In a pumped storage plant water is pumped from a lower reservoir, during periods when electric *601 power demand is low, up to a storage reservoir at a higher elevation. When supplemental power is needed, water is released, turning hydraulic turbine generators and producing electric power. The taxpayer in Consumers Power received final approval from the Federal Power Commission to fill its upper reservoir in September 1972. The following month it began pumping water into the upper reservoir. In November the generating mode was first synchronized with the transmission system and power was produced. Through December 5, 1972, as part of preoperational testing, the unit continued to produce power at levels ranging from 18 percent to 89 percent of rated capacity. Of the 4,580 megawatt hours of test power generated in that test period, 4,447 megawatt hours were sold to the taxpayer's customers. On December 7, however, power to the unit was temporarily disrupted and, due to a mechanical failure, parts of the turbine generator were damaged. As a result, testing was suspended and the unit was shut down for repairs. The repairs were not completed until January 9, 1973. Testing was then resumed and on January 17, 1973, testing was completed and the taxpayer accepted the unit from *602 the general contractor. On January 18, 1973, power became available for transmission into the Michigan Power Pool. The taxpayer in Consumers Power, like respondent in the present cases, contended that the plant was placed in service in 1972, when it was first synchronized with the transmission system and power was first produced and sold to customers. The taxpayer noted that the unit had operated successfully at its rated capacity in 1972. By contrast, the Commissioner maintained that the plant was not placed in service until 1973 because until that year (1) preoperational testing had not been completed; (2) responsibility and control had remained with the general contractor; and (3) sustained, regular generation of power had not occurred. We agreed with the Commissioner, stating: The amount of electrical power generated in 1972 is insufficient to establish that the [unit] was available for full operation on a regular basis in 1972. The generation of electrical power and the pumping of water into the upper reservoir were both necessary parts of preoperational testing. Accordingly, the production of some electrical power (even the sale thereof) and the filling of *603 the upper reservoir * * * do not establish that the [unit] was available for use in 1972. Not until January 17, 1973 after [the unit] successfully had completed all phases of preoperational testing, thereby demonstrating that it was available for service on a regular basis, was the unit in a state of readiness and availability for its specifically assigned function within the meaning of sections 1.46-3(d)(1)(ii) and 1.167(a)-11(e)(1)(i), Income Tax Regs. [Consumers Power Co. v. Commissioner, 89 T.C. at 724. Emphasis added.] Respondent's position in the instant cases is also contrary to his position in other cases where taxpayers have sought to treat property as placed in service before the property was available to produce income. For example, in Piggly Wiggly Southern, Inc. v. Commissioner, 84 T.C. 739 (1985), affd. 803 F.2d 1572 (11th Cir. 1986), the taxpayer sought to take investment tax credits and depreciation on equipment installed in stores that were not open for business until after the close of years in which the deductions and credits were claimed. The taxpayer contended that the equipment was available for *604 use, even though it was not actually put into use during the years in question because the stores did not open until the following years. The Commissioner disagreed because the equipment was not available to contribute to the taxpayer's income until the following years. We agreed with the Commissioner's analysis, stating: The cost of the equipment did not contribute to, and therefore should not be charged against, income for an accounting period prior to the years in which the stores opened for business. See Massey Motors, Inc. v. United States, 364 U.S. 92, 104 (1960). [Piggly Wiggly Southern, Inc. v. Commissioner, 84 T.C. at 748.] Similarly, Scherer Unit One did not contribute to, and was not available to contribute to, Oglethorpe's income before March 19, 1982, the date of commercial operation. Prior to that date, the critical testing of the unit's performance had not been concluded, a solution to the sonic vibration problem had not been found, and Georgia Power remained in control of the unit. Before March 19, 1982, Oglethorpe was entitled to no portion of the power generated by the unit, and it received no portion of that power. *605 Moreover, no portion of the unit's capacity was available for the Georgia Integrated Transmission System and, consequently, Oglethorpe received no income under its Agreement. Two of the witnesses in these cases were employees of Combustion Engineering, the company responsible for constructing the unit's boiler, which was the heart of the generating plant. One was offered by respondent and the other by Oglethorpe. Both agreed, however, that the boiler could not be considered available for the use for which it was intended until the second set of baffles had been installed and the destructive sonic vibrations had been eliminated. Both witnesses made it clear that they would not have released the boiler to Scherer Unit One owners for commercial operation until correction of that problem. In addition, a former vice president of Georgia Power testified that Georgia Power would not have accepted the boiler until the vibration problem was corrected. Two engineering experts, one a professor of mechanical engineering and the other an acoustical engineer, testified that until the vibration problem was corrected Scherer Unit One could not be deemed available for its assigned function since *606 it could not perform on a consistent, reliable and safe basis. Respondent argues that Scherer Unit One must have been placed in service when first synchronized because its specifically assigned function was to produce electrical power for sale to consumers and a substantial amount of electricity was produced and sold to consumers following synchronization. But Oglethorpe received none of this electricity and received no income from its sale. The test period energy was credited to Georgia Power. To be sure, the specifically assigned function of Scherer Unit One was not to be available to the Georgia Integrated Transmission System for dependable operation as a reserve unit. Not until the operational defects discovered during post-synchronization testing had been corrected and the unit had demonstrated its ability to sustain power generation near its rated capacity was Scherer Unit One available for the specific function for which it had been designed and constructed. As soon as that status was achieved on March 19, 1982, Georgia Power declared the unit in commercial operation and made it available to Oglethorpe for the production of income. Respondent has made several other arguments *607 that warrant our comments because we regard them as being fundamentally flawed. First, he asserts that consistent with "industry practice," the Internal Revenue Service accepts the initial synchronization date of an electric generating unit as its placed in service date. However, there is nothing in this record to support this assertion, other than a stipulation that Georgia Power began depreciation and claimed investment tax credit for Scherer Unit One on the date of initial synchronization. By contrast, the record is clear that Oglethorpe, a very large electric generation and transmission cooperative, followed its regular practice of utilizing the commercial operation date for financial and tax purposes by declaring that date as the placed in service date of Scherer Unit One. Even Georgia Power uses the commercial operation date for financial reporting purposes, and the Internal Revenue Service has chosen, or argued for, dates after initial synchronization. See Rev. Rul. 79-98, supra, Consumers Power Co. v. Commissioner, supra.
Respondent argues that Scherer Unit One performed its specifically assigned function when the chemical energy in *608 coal was converted to electrical power on the date of initial synchronization. He cites section 1.46-3(d)(2)(iii), Income Tax Regs., which provides that "property shall be considered in a condition or state of readiness and availability for a specifically assigned function [when it] is acquired for a specifically assigned function and is operational but is undergoing testing to eliminate any defects." From this regulation, he argues that Scherer Unit One was in service when it was first synchronized even though testing of the integrated unit under a load had not yet occurred. Respondent suggests that the regulation would have no meaning if "operational" were defined as "functioning perfectly or near perfectly." W note, however, that petitioners do not contend that "operational" should be equated to "near perfect," but they do contend that, properly construed, the term "operational" means operating in the fulfillment of its specifically assigned function, and not operating simply for the purpose of testing. This position seems consistent with the stipulation of the parties that "commercial operation" refers to the status of an electric generating plant as *609 part of the regular hierarchy of generating or other power resources available to the system operators as opposed to the situation of a new plant still being tested for acceptance into that status. Respondent has not cited any authority to support his position that equipment being tested is "operational" when it is being operated exclusively for testing purposes. In fact, the Service has ruled that an airplane which must be flown in order to be tested is not in service when it is merely being tested. Rev. Rul. 78-433, 1978-2 C.B. 121. The same is true of any other large, complex equipment. Accordingly, we think that not until the severe vibration problems in Scherer Unit One were corrected and it was considered sufficiently reliable to be placed under economic dispatch was the unit in fact operational within the meaning of the regulation. Testing to eliminate remaining defects continued after such events, but the unit was then no longer being operated solely for start-up testing purposes. To avoid facing the fact that Scherer Unit One was incapable of operating on a regular basis and thereby fulfilling its assigned function, respondent would eliminate the words *610 "regular operation" ( Consumers Power Co. v. Commissioner, supra at 725; Rev. Rul. 84-85 , supra) or "daily operation" (Rev. Rul. 76-256, supra) from the list of factors to be considered in determining when an electric generating unit is placed in service. Respondent next attempts to show that the "control" component has been satisfied. He focuses on the fact that the Ownership Agreement between Georgia Power and Oglethorpe made Georgia Power the agent of Oglethorpe in the construction of Scherer Unit One. This same relationship existed between Georgia Power and the other entities which purchased interests in Scherer Unit One from Georgia Power. What respondent ignores, however, is the fact that the agreement gave Georgia Power sole and exclusive responsibility for construction, allowing Georgia Power the right to take all steps considered reasonable within its discretion. The agreement provided that the sole remedy of Oglethorpe and the other co-owners was to remove Georgia Power by a vote of 75 percent of the ownership interests, a requirement that plainly exceeded Oglethorpe's 60-percent ownership interest. Thus the *611 Ownership Agreement did not allow Oglethorpe to control any aspect of the construction of Scherer Unit One. This was consistent with Georgia Power's past practices where ownership interests in other plants were sold before construction was completed. Georgia Power always acted as the general contractor on these plants, and it did not give up this controlling position when it sold undivided interests in these plants to other co-owners. Accordingly, in the Ownership Agreement, and in actual operation, Georgia Power retained control over Scherer Unit One until the point of commercial operation. Not only did Georgia Power retain full control over Scherer Unit One until it was declared in commercial operation, but it also retained the sole right to any power produced by the unit before that declaration. The power was the natural by-product of Georgia Power's retention of control during the testing period. Thus, while respondent relies on the fact that Scherer Unit One produced test period energy as a basis for arguing that the unit was in service during that period, the undisputed fact is that Oglethorpe was entitled to none of that energy and respondent has made this argument despite *612 our admonition in the Consumers Power case that the production (and even the sale) of test period energy does not establish that a generating plant is available for service. Respondent tries to avoid the force of Consumers Power by interpreting our opinion as having turned on the control of the unit by the general contractor beyond the date of initial synchronization. It is true that in Consumers Power the Commissioner argued that an electric generating unit had not been placed in service because control of the unit had remained with the contractor until the unit was formally accepted by its owner. However, the Commissioner also argued that the testing and repairs were not complete and that sustained and regular generation of electrical power did not occur until that time. In choosing the later date, as opposed to the date of initial synchronization, we agreed with respondent but only on two factors -- the completion of testing and the providing of electrical power on a regular basis: Although unit 1 pumped water into the reservoir and generated electrical power during preoperational testing in 1972, unit 1 was not available in 1972 to provide electrical power on *613 a regular basis in 1972. The amount of electrical power generated in 1972 is insufficient to establish that the Ludington Plant was available for full operation on a regular basis in 1972. The generation of electrical power and the pumping of water into the upper reservoir were both necessary parts of preoperational testing. * * * Not until January 17, 1973, after unit 1 successfully had completed all phases of preoperational testing, thereby demonstrating that it was available for service on a regular basis, was the unit in a state of readiness and availability for its specifically assigned function within the meaning of sections 1.46-3(d)(1)(ii) and 1.167(a)-11(e)(1)(i) * * *. Although the mechanical failure that caused the shutdown of unit 1 on December 7, 1972, may have been beyond the control of petitioner, unit 1 was not yet ready and available for regular operation as of that date. [Consumers Power Co. v. Commissioner, 89 T.C. at 724. Emphasis added.] Respondent argues that any events that took place after initial synchronization are irrelevant. We disagree and find no logical reason why this should be the case. No authority *614 is cited by respondent to support his argument. Indeed, our opinion in Consumers Power demonstrates that events occurring after initial synchronization were not only relevant but also prevented the unit from being "ready and available for regular operation." Consumers Power Co. v. Commissioner, supra at 725. We find no merit in respondent's analogy that the sonic vibration problems experienced at Scherer Unit One were similar to the rattling of an automobile's tailpipe. There is no comparison between an electric generating unit of the size of Scherer Unit One and a mass-produced automobile, much less the similarity of the rattling of an automobile tailpipe to massive and destructive sonic vibrations in an electric generating plant. Respondent contends that the sale of power during the test period of Scherer Unit One indicates that the unit was placed in service, and that the production of income is not necessary to find that the unit was placed in service. In making these arguments, respondent fails to overcome an essential fact that was not disputed by any trial testimony, i.e., Oglethorpe was not entitled to any of the test period energy, and Scherer *615 Unit One was not made available to Oglethorpe for the production of income until the date of commercial operation. Georgia Power was unilaterally entitled to the test period income and absorbed the expenses incurred during the testing period. A lengthy argument is made by respondent that Georgia Power utilized Scherer Unit One and placed it in service on November 28, 1981, and that it could not have been done independently of and without affecting Oglethorpe. Consequently, he argues that there cannot be two separate placed in service dates for the electric generating unit. Suffice it to say that what Georgia Power, a minority co-owner of Scherer Unit One, did in treating the unit as being "placed in service" does not bind Oglethorpe. If Georgia Power chose the wrong placed in service date for Scherer Unit One, then that is Georgia Power's problem. Finally, respondent maintains that commercial operation is merely a "subjective" determination. However, our view is that a declaration that an electric generating unit is in commercial operation is no more subjective than a determination of the date on which first to synchronize the unit. In fact, as respondent's expert witness *616 conceded, the same engineering experts who make the determination that a unit is ready to be synchronized with the transmission system also make the determination that the unit is ready to operate in the system and therefore should be declared to be in commercial operation. Both dates can be identified objectively because they are matters of record; the determination of what each date should be is, in both instances, subjective. In the case of commercial operation, however, if it does not take place within 90 days of initial synchronization, a report must be submitted to the Federal Energy Regulatory Commission detailing the reasons for the delay. In that sense, an external, objective factor operates to make the decision to declare commercial operation less subjective than the decision to first synchronize, which has no such reporting requirements. Respondent attempts to minimize the importance of the commercial operation date by suggesting that the availability of the unit for system dispatch is unimportant since units are often run out of economic dispatch and, in fact, this was the case with Scherer Unit One. What is important, however, is the availability of the unit to the *617 transmission system, not whether the system dispatcher chose to run the unit in or out of economic dispatch. Respondent also contends that commercial operation is merely a date picked for accounting purposes, citing Old Colony R.R. v. Commissioner, 284 U.S. 552 (1932), for the proposition that an agency-imposed compulsory accounting practice does not necessarily dictate tax consequences. That decision is cited in an attempt to overcome the fact that the SEC, FERC, and REA all treat the commercial operation date as the placed in service date. While accounting practice is not conclusive of the placed in service issue for Federal tax purposes, it is persuasive. As the Supreme Court stated in Commissioner v. Idaho Power Co., 418 U.S. 1, 15 (1974): where a taxpayer's generally accepted method of accounting is made compulsory by the regulatory agency and that method clearly reflects income, it is almost presumptively controlling of federal income tax consequences. Respondent obviously takes the position that the appropriate accounting practice has no bearing on the placed in service determination because the uniform system of accounts *618 prescribed by FERC provides that depreciation on an electric generating plant is to begin on the date of commercial operation. Accordingly, we hold that Scherer Unit One was placed in service on March 19, 1982. It therefore follows that the safe harbor leases executed on April 9, 1982, are valid. To permit the settlement of remaining issues and, if necessary, the trial of others, An appropriate order will be issued. Footnotes
1. Consolidated herewith are Rollins, Inc. and Subsidiaries, docket No. 2873-88, and National Service Industries, Inc., docket No. 3690-88.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment attributable to fraud.↩