**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 93-4269

SEALY POWER, LTD., DONALD E. RUTT,
Tax Matters Partner,

Petitioner-Appellant
Cross-Appellee

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee
Cross-Appellant.

Appeal from a Decision of the United States Tax Court

February 15, 1995

Before HIGGINBOTHAM and WIENER, Circuit Judges, and KAUFMAN[*],

District Judge.

WIENER, Circuit Judge:

On the procedural level, Plaintiff-Appellant Sealy Power, Ltd. (Sealy), a Texas limited partnership, appeals the Tax Court's determination that the notice of Final Partnership Administrative Adjustment (FPAA) issued by the Commissioner of Internal Revenue (Commissioner) did not shift to the Commissioner the burden of

---

[*]District Judge of the District of Maryland, sitting by designation.

going forward with the evidence. On the substantive level, Sealy appeals the Tax Court's denial of its claimed depreciation deductions and energy and investment tax credits.

With respect to the FPAA, we affirm the Tax Court's determination that such adjustment did not shift to the Commissioner the burden of going forward with the evidence. In determining that Sealy's property was placed in service in 1984, we reverse the Tax Court's ruling on Sealy's entitlement to the depreciation deductions and credits.

The Commissioner cross-appeals the Tax Court's refusal to address the pre-operating expense issue concerning the deductibility of certain of Sealy's expenses. As we conclude that the Tax Court erred in finding that the Commissioner did not properly raise the pre-operating expense issue prior to the Rule 155 computation proceeding, we reverse and remand on this point.

FACTS AND PROCEEDINGS

The parties submitted an extensive Stipulation of Facts and Supplemental Stipulation of Facts which the Tax Court incorporated by reference in its opinion. The facts necessary to resolve the disputed issues are set forth below.

In 1983, Sealy engaged the engineering firm Energy Advancement, Inc. (EAI) to build a power production facility in Sealy, Texas (the City) on property leased from the City and

located next to the City's landfill.[1]  Sealy's plan was to generate electricity by incinerating the solid waste deposited in the landfill and then sell the electricity to Houston Lighting and Power (HL&P).  The electric generating project was an attractive way for the City to avoid the rising costs of obtaining additional landfill space, delegate the operation of the landfill, and foster the creation of alternative energy sources in its community.

Tor Lileng, an EAI engineer, designed and supervised the construction of the facility.  Lileng's design involved acquiring various ready-made manufacturer components with a certain capacity rating, constructing foundations for these components, and connecting them through wiring and piping.  Construction began early in 1983 and the facility was substantially completed that same year at a cost of approximately $ 3,500,000.  In 1984, Sealy completed its agreement to sell its electricity to HL&P.  From the winter of 1983 through a portion of 1988, Sealy operated the landfill adjacent to the facility, employing two gatekeepers and receiving small tipping fees from commercial establishments for garbage disposal.  Under the terms of Sealy's ground lease with the City, its residents could dispose of their garbage at the landfill at no charge.

Sealy first operated the incinerator at the facility in 1983.

---

[1]Both general partners of Sealy Power, Jim Connatser and Donald Rutt, owned minority interests in EAI.  Further, Jack Reber was the President and a 72% shareholder of EAI as well as a limited partner of Sealy Power, Ltd.  EAI devised the Sealy cogeneration plant project and Sealy provided the financing for it.

Two pieces of equipment in the facility, the feed mechanism and the ash conveyor, presented minor, correctable difficulties in the operation of the facility. The most severe problem, however, was the incinerator, the centerpiece of the facility. The function of the primary chamber of the incinerator was to burn the garbage into gases which in turn would be burned in a second chamber and passed through the vaporizer, steam superheater, and steam turbines to create energy. The manufacturer of the incinerator had claimed it would generate 20 million BTUs per hour, but the incinerator never reached its rated capacity of electricity generation because the manufacturer had delivered a primary chamber considerably smaller than the one EAI had specified for Sealy. These equipment deficiencies prevented the facility from generating commercial quantities of electricity, so Sealy tried to find investors willing to provide the additional funds required to correct the facility's operational problems. After all such efforts failed, Sealy filed for bankruptcy on July 1, 1988.

A few months earlier, on March 30, 1988, the Commissioner had issued a notice of Final Partnership Administrative Adjustment (FPAA) determining that Sealy was not entitled to several deductions and credits.[2] Donald E. Rutt, Sealy's tax matters partner, then filed a petition for readjustment of partnership items. The Tax Court ruled against Sealy on all tried issues. Pursuant to Rule 155 of the Tax Court Rules of Practice and

---

[2]Another issue before the Tax Court, but not involved in this appeal, was whether Sealy's partners were at-risk within the meaning of I.R.C. § 465.

4

Procedure, the court required the parties to submit proposed decision documents consistent with the court's opinion.

Sealy timely objected to the Commissioner's proposed computation, disallowing deductions for certain expenses incurred in 1983 and 1984 which the Commissioner deemed to be nondeductible pre-operating expenses. Sealy maintained that it was entitled to a deduction for its ordinary business expenses, insisting that the Commissioner's computation was inconsistent with the Tax Court's ruling on that point. The Tax Court agreed with Sealy and issued an order requiring the entry of a new computation. Both Sealy and the Commissioner timely appealed the respective portions of the court's decision that were adverse to them.

## II

## ANALYSIS

A.  STANDARD OF REVIEW

Our standard of review for appeals from the United States Tax Court is the same as for civil actions decided by the district courts.[3]  Thus, we review findings of fact under a clearly erroneous standard and legal conclusions de novo.[4]

B.  THE FPAA NOTICE

The Tax Court held that the nature of the FPAA notice did not

---

[3]26 U.S.C. § 7482(a)(1)(1993)("United States Courts of Appeals . . . shall have exclusive jurisdiction to review the decisions of the Tax Court . . . in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury.").

[4]See Estate of Clayton v. Commissioner, 976 F.2d 1486, 1490 (5th Cir. 1992).

shift to the Commissioner the burden of going forward with the evidence. Sealy appeals this ruling, arguing that the Commissioner issued an FPAA that was arbitrary and capricious, thereby meriting a shift of the burden. Alternatively, Sealy argues that the FPAA is invalid because it was not a considered determination and that the Tax Court therefore lacked jurisdiction. The Tax Court did not make a factual finding of whether the FPAA was arbitrary, but held instead that Sealy continued to bear the burden of going forward with the evidence because the FPAA did not involve unreported illegal income. This presents a question of law which we review de novo.

The FPAA sent to Sealy noted that the Commissioner had determined adjustments to the partnership's 1983 and 1984 returns. The Commissioner listed the adjustments, specifying the items on the returns which were affected for the tax years in question. In an attachment to the schedule of adjustments, the FPAA noted that the Commissioner was disallowing the claimed deductions and credits because Sealy had not established that its activity had any economic substance, was engaged in for profit, constituted a trade or business, or involved property held for the production of income.

As the prerequisite for litigation over disputed items on a partnership's return, an FPAA is the functional equivalent of a notice of deficiency.[5] Both the FPAA and the notice of deficiency serve to notify affected taxpayers that the Commissioner has made

---

[5]See Maxwell v. Commissioner, 87 T.C. 783, 788-89 (1986).

a final administrative determination of their liability for particular tax years.[6] We therefore analyze the FPAA here the same way that we would analyze a notice of deficiency.

The Internal Revenue Code does not specify the form or content of a valid notice of deficiency. Courts have held, however, that the notice generally must advise the taxpayer that the Commissioner has determined a deficiency for a particular year and must specify the amount of the deficiency or provide the information necessary to compute the deficiency.[7] A determination of deficiency issued by the Commissioner is generally given a presumption of correctness, which operates to place on the taxpayer the burden of producing evidence showing that the Commissioner's determination is incorrect.[8] Several courts have recognized, however, that they need not give effect to the presumption of correctness and may instead shift the burden from the taxpayer to the Commissioner when the notice of deficiency is determined to be arbitrary or

---

[6]See Seneca, Ltd. v. Commissioner, 92 T.C. 363, 368 (1989), aff'd without opinion, 899 F.2d 1225 (9th Cir. 1990); Clovis I v. Commissioner, 88 T.C. 980, 982 (1987).

[7]See Portillo v. Commissioner, 932 F.2d 1128, 1132 (5th Cir. 1991); Donley v. Commissioner, 791 F.2d 383, 384 (5th Cir. 1986), cert. denied, 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 253 (1986).

[8]See United States v. Janis, 428 U.S. 433, 441, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046,    (1976); Helvering v. Taylor, 293 U.S. 507, 514-15, 55 S.Ct. 287, 290-91, 79 L.Ed. 623,    (1935); Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212,    (1933); Portillo, 932 F.2d at 1133.

7

excessive.[9]  In these cases, the notice of deficiency involved a determination of unreported income, whether from legal sources, as in Portillo[10], or from illegal sources, as in Jackson[11].

We have previously recognized that the reason behind the burden-shifting principle in an unreported income case is that the taxpayer bears the difficult burden of proving the non-receipt of income.[12]  The Commissioner's determination in such a case necessarily involves reconstructing income that should have been reported, potentially leading to questionable results.[13]  If the

---

[9]See Williams v. Commissioner, 999 F.2d 760, 763-64 (4th Cir. 1993), cert. denied 114 S.Ct. 442, 126 L.Ed.2d 376 (1993); Portillo, 932 F.2d at 1133-34; Zuhone v. Commissioner, 883 F.2d 1317, 1325-26 (7th Cir. 1989); Anastasato v. Commissioner, 794 F.2d 884, 887 (3d Cir. 1986); Dellacroce v. Commissioner, 83 T.C. 269, 280, 287 (1984); Jackson v. Commissioner, 73 T.C. 394, 401 (1979).  The Supreme Court in Janis recognized that the usual presumption of correctness does not apply when the government's assessment constitutes a "`naked' assessment without any foundation whatsoever."  See Janis, 428 U.S. at 441, 96 S.Ct. at 3026, 49 L.Ed.2d at    .
Even while carving out this exception to the general rule of presuming the determination correct, courts have reaffirmed their reluctance to look behind the notice of deficiency to determine whether the Commissioner's determination is arbitrary.  See Anastasato, 794 F.2d at 886-67; Dellacroce, 83 T.C. at 280 (1984).

[10]932 F.2d at 1130-31, 1134 (subcontractor's unreported income from contractor).

[11]73 T.C. at 396-97, 402 (unreported income from drug trafficking activities).

[12]See Portillo, 932 F.2d at 1133-34; Carson v. United States, 560 F.2d 693, 698 (5th Cir. 1977).

[13]See Portillo, 932 F.2d at 1134 (notice based on unverified "bald assertion" of third party); Weimerskirch v. Commissioner, 596 F.2d 358, 361-62 (9th Cir. 1979)(notice stemmed from IRS' "naked assertion" that petitioner had received money from heroin sales); Jackson, 73 T.C. at 403 ("elaborate construct set out in the deficiency notice . . . turns out to be sheer gossamer").

Commissioner does not substantiate the notice's determination with some predicate evidence, therefore, the taxpayer should be relieved of the burden of going forward with the evidence. The issue we must decide in the instant case is whether the same principle applies when the notice of deficiency involves not unreported income but a taxpayer's entitlement to deductions and credits.

In Gatlin v. Commissioner[14], the Eleventh Circuit considered whether the burden-shifting principle for unreported income cases applies in deduction cases. It held that in a deduction case the taxpayer at all times retains the burden of going forward with the evidence that supports the claimed deductions and their amounts, regardless of the nature of the Commissioner's notice of deficiency.[15] The Gatlin court observed that, unlike the taxpayer in an unreported income case, the taxpayer with challenged deductions has reported the full amount of income but has claimed deductions, reducing the total tax due on the income.[16] As the taxpayer in Gatlin was "privy to the facts that substantiate a deduction," the court ruled, the Commissioner's notice of deficiency retained its presumption of correctness until the taxpayer came forward with evidence to challenge its assessment.[17] Several other courts have recognized the distinction between deduction cases and unreported income cases for purposes of

---

[14]754 F.2d 921 (11th Cir. 1985).

[15]See id. at 923.

[16]See id. at 924.

[17]See id.

9

shifting the burden of production.[18]

We agree with these courts that the burden-shifting principle for unreported income cases should not extend to cases in which the Commissioner rejects deductions or credits claimed by a taxpayer. The burden of overcoming the presumption of correctness in a deduction case properly rests with the taxpayer, who is the best source of information for determining entitlement to the claimed deductions. In a deduction case, therefore, we apply the general rule of not looking behind the notice of deficiency to determine whether it is arbitrary. As the FPAA here challenged Sealy's entitlement to deductions and credits, not Sealy's failure to include taxable income, the Tax Court properly preserved the presumption of correctness in requiring Sealy to continue to bear the burden of going forward with the evidence.

Sealy also contends that the Commissioner's FPAA was void ab initio, stripping the Tax Court of jurisdiction in the case, because it was not a considered determination. Sections 6212(a) and 6213(a) of the Internal Revenue Code provide that the Tax Court only has jurisdiction when the Commissioner issues a valid deficiency notice and the taxpayer files a petition for

---

[18]United States v. Walton, 909 F.2d 915, 918-19 (6th Cir. 1990); LaBow v. Commissioner, 763 F.2d 125, 131-32 (2d Cir. 1985); Foster v. Commissioner, 756 F.2d 1430, 1439 (9th Cir. 1985), cert. denied, 474 U.S. 1055, 106 S.Ct. 793, 88 L.Ed.2d 770 (1986); Chaum v. Commissioner, 69 T.C. 156, 163-64 (1977). See also Bennett Paper Corp. v. Commissioner, 699 F.2d 450, 453 (8th Cir. 1983)(rejecting taxpayer's argument that assessment was arbitrary, as burden of proof lies with taxpayer to show right to claimed deduction).

redetermination.[19] The partnership cites to <u>Scar v. Commissioner</u>[20], one of but a handful of cases in which a court of appeals has invalidated a notice of deficiency upon finding that the Commissioner had failed to make a considered determination.[21] Sealy's reliance on <u>Scar</u> is misplaced. In <u>Scar</u>, the notice referred to a tax shelter that had no connection to the taxpayers or their return and stated that, because the taxpayers' return was not available, the Commissioner was imposing the maximum tax rate to the adjustment amount.[22] This led the court to conclude that, on its face, the purported notice of deficiency revealed that the Commissioner had not examined the taxpayers' return for the year in dispute and therefore had not made any determination of tax deficiency.[23]

We have previously held that courts have interpreted the term "determination" to mean, for purposes of Section 6212(a), a "thoughtful and considered determination that the United States is

---

[19]<u>See</u> <u>Stamm Int'l Corp. v. Commissioner</u>, 84 T.C. 248, 251-52 (1985).

[20]814 F.2d 1363 (9th Cir. 1987).

[21]The court in <u>Scar</u> found that the notice of deficiency did not meet the requirement in Section 6212(a) that the Commissioner "determine that a deficiency exists before issuing a notice of deficiency." <u>See</u> <u>Scar</u>, 814 F.2d at 1370. As a valid notice of deficiency is a necessary basis for Tax Court jurisdiction, the court concluded that the Tax Court should have dismissed the action for want of jurisdiction. <u>See</u> <u>id.</u>

[22]<u>See</u> <u>id.</u> at 1365.

[23]<u>See</u> <u>id.</u> at 1368-70.

11

entitled to an amount not yet paid.[24]"  A review of the FPAA here shows that, unlike the putative determination in Scar, the Commissioner did consider Sealy's return in determining the adjustments listed in the FPAA.  The FPAA set out the adjustment items for each year, enabling Sealy to determine its deficiency.  It also explained in an attachment the reasons for the Commissioner's adjustments.[25]  Sealy's argument that the FPAA was broadly drafted and that the Commissioner's review was faulty is unavailing.[26]  The FPAA on its face reflects that the Commissioner

---

[24]See Portillo v. Commissioner, 932 F.2d 1128, 1132 (5th Cir. 1991)(quoting Scar, 814 F.2d at 1369).

[25]The Commissioner later stipulated that Sealy had never been a sham and that it had a valid business purpose during 1983 and at all times thereafter, contradicting two of its reasons stated in the FPAA for disallowing Sealy's deductions and credits.  This does not affect our finding that the Commissioner issued a "thoughtful and considered determination," however.  The Commissioner, in considering a taxpayer's return and "determining" a deficiency, may challenge items for reasons that the parties can later clarify or correct when they confer and exchange necessary facts and documents.  See Foster v. Commissioner, 80 T.C. 34, 230
(1983)(noting usefulness of parties informally conferring to narrow issues), aff'd and vacated on other grounds, 756 F.2d 1439 (9th Cir. 1985).
     A  notice of deficiency, which merely serves as a warning to the taxpayer that the Commissioner has assessed a deficiency and plans to hail the taxpayer into court, need not give any reasons for the assessment of a deficiency.  See Scar, 814 F.2d at 1367; Clapp v. Commissioner, 875 F.2d 1396, 1403 (9th Cir. 1989).  On rare occasions, as in Scar, however, the reason given on the face of the notice reveals that the Commissioner failed to make a determination.  The Commissioner's grounds for making the adjustments in Sealy's FPAA, unlike the erroneous explanation and imposition of an arbitrary tax rate in Scar, do not reveal that the Commissioner failed to make a "determination" for purposes of the Tax Court's jurisdiction.

[26]See Riland v. Commissioner, 79 T.C. 185, 199-201 (1982)(notice valid despite Commissioner's violation of internal procedures); Estate of Brimm v. Commissioner, 70 T.C. 15, 22-23

12

made a "determination" for purposes of the Tax Court's jurisdiction.[27]

As the FPAA constituted a valid determination entitled to a presumption of correctness, we conclude that the Tax Court properly required Sealy to bear the burden of going forward with the evidence after it challenged the Commissioner's adjustments in the FPAA to Sealy's deductions and credits.

C.   "PLACED IN SERVICE"

Sealy claimed a biomass energy tax credit and an investment tax credit in 1983, as well as depreciation deductions in 1983 and 1984.   The Commissioner disallowed these items in the FPAA and Donald Rutt, as Sealy's tax matters partner, filed a petition in Tax Court for readjustment of partnership items.   The Tax Court upheld the Commissioner's determination, finding that the property

_____

(1978)(notice valid even though taxpayer argued that Commissioner perfunctorily performed review functions and used flawed procedures); Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327-30 (1974)(notice valid despite allegation that Commissioner discriminatorily selected taxpayer for audit).

[27]Sealy also refers to our decision in Pearce v. Commissioner, No. 91-4178 (5th Cir. 1991)(unpublished opinion), in which we held that the Tax Court lacked jurisdiction because the notices were void ab initio.  The notices reflected "gross ineptitude" on the part of the Commissioner because they ignored the filing status designation on the taxpayer's return, applied an incorrect tax rate, and ignored claimed exemptions.
The facts of the instant case differ greatly.  As we have noted, the FPAA sent to Sealy did not reveal a lack of a considered determination because it referred to disputed items in Sealy's return and explained the Commissioner's reasons for the adjustments.  We rejected a similar argument in Portillo where, as here, the Commissioner had considered information directly relating to the taxpayer's income tax return and had investigated whether a deficiency existed.  See Portillo v. Commissioner, 932 F.2d 1128, 1132 (5th Cir. 1991).

in Sealy's facility was never "placed in service"SQnot in 1983, not in 1984, not everSQand that, therefore, Sealy was not entitled to its claimed depreciation deductions and investment tax credits.

Several provisions of the Internal Revenue Code are implicated in this appeal. Section 167(a)[28] provides that a depreciation deduction is allowed for property used in the taxpayer's trade or business or for property held for the production of income. Section 38(a) allows for investment and energy tax credits; Section 46 outlines the calculation of the investment tax credit amount, and Section 48 defines property eligible for the credits. The pertinent portions of Section 48 state that the credits are available for certain "biomass property[29]" and for "tangible personal property" and "other tangible property," but only if the "other tangible property" is used as an integral part of a qualifying activity.[30]

Treasury Regulation 1.167(a)-11(e)(1)(i)[31] states that property is first placed in service for purposes of the depreciation deduction when it is "placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity." For purposes of the

---

[28]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

[29]See I.R.C. § 48(l)(15)(1984).

[30]See I.R.C. §§ 48(a)(1)(A); 48(a)(1)(B)(1984).

[31](1984).

14

investment tax credit, Treasury Regulation 1.46-3(d)(1)(ii)[32] defines the time that Section 38 property is "placed in service" as the taxable year in which such property is "placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity." Courts have interpreted the regulations' identically-worded "placed in service" tests for depreciation deductions and tax credits in the same manner.[33]

### 1.   Component Parts v. Facility as a Whole

The Tax Court properly ruled that the component assets of Sealy's facility were all tangible personal property within the meaning of Section 48(a)(1)(A) as well as Section 38 property qualifying for depreciation and the energy and investment tax credits if and when placed in service.[34]  Sealy asserts that the "placed in service" test should apply separately to each of these components of the facility rather than to the facility as a whole.[35]

---

[32](1984).

[33]See Armstrong World Indus., Inc. v. Commissioner, 974 F.2d 422, 431-36 (3d Cir. 1992); Oglethorpe Power Corp. v. Commissioner, 60 T.C.M. (CCH) 850, 859 (1990); Consumers Power Co. v. Commissioner, 89 T.C. 710, 723 (1987).

[34]The Tax Court listed the facility as containing a hopper with a screw/auger feeder, an incinerator, a tractor, a conveyor, and various pieces of equipment such as a vaporizer, steam superheater, separator, expander, and steam turbines.  These are all in the nature of machinery and equipment, which the Regulation deems to be "tangible personal property."  See Treas. Reg. § 1.48-1(c).

[35]Sealy argues in the alternative that it is entitled to depreciation and investment tax credits because its tangible

15

As each of the items of machinery and equipment comprising the facility was in a condition of being "ready and available for a specifically assigned function" in the facility, Sealy argues, the partnership was entitled to depreciation and investment tax credits on these items even if the facility is deemed not to have been operational. This approach, however, does not conform to the analysis of Revenue Rulings and cases dealing with the "placed in service" requirement.

In Revenue Ruling 73-518[36], the Commissioner stated that a major electrical transmission line was not placed in service, even though it was complete, until the substations at the end of the line were completed and the line could be energized. As the substations were parts of the system and were necessary for the transmission of electricity, both the transmission line and the substations were first placed in service when the whole system was first available for service. Revenue Ruling 76-238[37] adopted a similar approach in noting that individual units of production machinery and equipment acquired for use in a factory were not

---

personal property is subject to a different "placed in service" test than "other tangible property." The partnership refers to the distinction between § 48(a)(1)(A), "tangible personal property," which qualifies for the investment tax credit "irrespective of whether it is used as an integral part" of a qualified activity, and § 48(a)(1)(B), "other tangible property," which qualifies for the credit only if it used as an integral part of a qualifying activity. See Treas. Reg. § 1.48-1(c), (d). In view of our disposition of this case, we need not and therefore do not reach the merits of this argument.

[36]1973-2 C.B. 54.

[37]1976-1 C.B. 55.

placed in service until they were installed in the production line and the entire production line had been completed. This ruling further observed that on the completion of the entire production line, the "line was available for the production of an acceptable product, notwithstanding later testing to eliminate defects which prevented attainment of planned production levels or the meeting of acceptable quality control parameters.[38]" Both rulings indicate that components are not to be considered placed in service separately from the system of which they are an essential part.

The Tax Court in several cases has embraced the Revenue Rulings' approach of examining, for purposes of the "placed in service" test, property in a project as a whole when a number of interdependent components are designed to operate as a system. In these cases, the Tax Court has found that an individual component, incapable of contributing to the system in isolation, is not regarded as placed in service until the entire system reaches a condition of readiness and availability for its specifically assigned function.[39] Other circuit courts have used the same

---

[38]See id.

[39]See, e.g., Siskiyou Communications, Inc. v. Commissioner, 60 T.C.M. (CCH) 475, 478-79 (1990)(telephone switching equipment and toll carriers not placed in service even though capable of performing individual functions because wiring for system not completed and employees not trained in system's use); Consumers Power Co. v. Commissioner, 89 T.C. 710, 725-26 (1987)(upper reservoir component of pumped storage hydroelectric plant not placed in service until entire plant placed in service because physical plant and reservoir operated simultaneously as one integrated unit to produce electrical power).

approach as the Tax Court.[40]  We agree with these courts' approach and find that the Tax Court appropriately treated the assets of Sealy's facility as functionally forming a single property for purposes of the "placed in service" determination.

As our focus is on Sealy's facility as a whole, it is necessary to determine the type or kind of facility involved. Sealy contends that in determining whether the facility has been placed in service, it should be treated as a waste disposal facility rather than an electric generating facility.  Sealy refers to the parties' stipulation that the partnership's stated purpose was to "acquire, fund, and operate a unique waste disposal facility and the adjacent landfill" and emphasizes that the stipulation does

---

[40]See, e.g., Hawaiian Indep. Refinery, Inc. v. United States, 697 F.2d 1063, 1069 (Fed. Cir. 1983), cert. denied 464 U.S. 816, 104 S.Ct. 73, 78 L.Ed.2d 86 (1983)(two offsite components not considered separately from refinery in determining applicable construction date because all were designed and constructed as single unit and together they functionally formed single property); Public Serv. Co. v. United States, 431 F.2d 980, 983-84 (10th Cir. 1970)(component assets of electric power plant not considered separately for "placed in service" determination because no one of them would serve any useful purpose until fitted together to constitute a complete unit). The Hawaiian and Public Service cases dealt with the date of acquisition or construction of qualifying property under the investment tax credit provisions and not the "placed in service" date of qualifying property as in the instant case.  We note, however, that the concepts are sufficiently similar to serve as an analogue for the "placed in service" determination.
The Third Circuit in Armstrong World Indus., Inc. v. Commissioner, 974 F.2d 422, 432-35 (3d Cir. 1992), reviewed the caselaw relevant to the "placed in service" test for a railroad project with individual components and concluded that unlike the component parts of the projects in Consumers, Siskiyou, Hawaiian, and Public Serv., each completed train track segment in Armstrong had independent utility and was placed in service prior to the time all of the project components were completed and available for use.

not mention the generation of electricity. Like the Tax Court before us, however, we are not persuaded by this argument. Clearly the substance of Sealy's intended business activity was to make a profit from the sale of electricity generated from incinerating the landfill's solid waste. Electricity generation was the feature that made the facility "unique" as described in the stipulation. The small tipping fees Sealy collected from commercial businesses which were disposing of their waste were insignificant relative to Sealy's investment in the facility. Further, Sealy's waste disposal activitySQmaintaining a fuel sourceSQwas merely a tangential part of the primary function of its trade or business, producing electricity. The "placed in service" analysis, therefore, is properly focused on the property's contribution to Sealy's objective of generating electricity in its facility.

2.    The Tax Court's Interpretation of the "Placed in Service" Regulations

The Tax Court stated that it did not need to decide whether the facility as a whole satisfied each of the five "placed in service" factors outlined in various Revenue Rulings. It instead looked to its prior decisions in Oglethorpe Power Corp. v. Commissioner[41] and Consumers Power Co. v. Commissioner[42], two other cases involving electric generating facilities, and ruled that Sealy's facility was not placed in service because, having failed ever to achieve its anticipated electricity output levels, it never

[41]60 T.C.M. (CCH) 850 (1990).

[42]89 T.C. 710 (1987).

19

operated on a regular basis.

### a.    Consumers Power Co. v. Commissioner

In Consumers, the Tax Court found that a unit contained in a pumped storage hydroelectric plant was not placed in service in 1972, the year for which the taxpayer had claimed depreciation deductions and investment tax credits.[43]  In that year, the unit had not yet completed the preoperational testing phase required by the Federal Power Commission and had not been formally accepted from the contractor.[44]   The Consumers court also observed that even though the unit had pumped water into the reservoir and generated electrical power during the testing phase in 1972, the amount of electrical power generated was "insufficient to establish that the . . . [p]lant was available for full operation on a regular basis in 1972."[45]   It concluded that the unit was not in a state of readiness and availability for its specifically assigned function until it had completed all phases of the governmentally mandated preoperational testing.

The Tax Court in Consumers did not rest its opinion on the low

---

[43]The court explained that a pumped storage plant provides supplemental electrical power during periods of peak energy demands by releasing water from an elevated reservoir to another reservoir below.  The water flows through a turbine generator on the way down, thereby producing electrical power.  See Consumers, 89 T.C. at 716-17 (quoting Stanley Works v. Commissioner, 87 T.C. 389, 391 (1986)).  In Consumers, Lake Michigan served as the lower reservoir for the plant and the unit that was the subject of the opinion was composed of a tunnel, pumphouse, and a pump-turbine generator.  See id. at 717.

[44]See id. at 717-19, 724.

[45]See id. at 724.

amount of power generated from the unit. Rather, it held that the unit was not placed in service until after it had successfully completed testing. Yet in referring to the small amount of power output as support for its conclusion, the court implicitly adopted the Commissioner's argument that the unit was not placed in service in 1972 because, inter alia, it did not show sustained, regular generation of electrical power. The opinion does not reveal the source of the Tax Court's adoption of this standard. It merely cites to the Tax Court's previous decisions in Noell v. Commissioner[46] and Madison Newspapers, Inc. v. Commissioner[47], both of which are distinguishable and inapposite.

The Tax Court in Noell had held that a new airport runway was not placed in service until it was paved and available for regular use, even though some pilots occasionally took the risk and used the rocky strip for landings prior to the runway's completion.[48] Unlike the fully-constructed unit in Consumers, however, the runway in Noell was under construction and never completed in the year for which the taxpayer had claimed the investment credit.[49]

Likewise, the Consumers court's reliance on Madison Newspapers sheds no light on the Tax Court's insistence on a facility's

---

[46]66 T.C. 718 (1976).

[47]47 T.C. 630 (1967), acq., 1975-2 C.B. 2.

[48]See Noell, 66 T.C. at 729.

[49]See id. The Tax Court in the instant case cited to Noell as support for its conclusion as well, even though Sealy's electric generating facility was completed in 1983 except for a few minor pieces of heat-recovering equipment.

ability regularly to achieve its anticipated output before it may qualify for the investment tax credit and depreciation. In Madison Newspapers, the Tax Court held that the taxpayer was entitled to the investment tax credit for three units of an eight-unit printing press, even though those three units were on the taxpayer's premises before the entitlement period for the credit began, because the taxpayer "acquired" the units only when they were installed and accepted by the taxpayer as ready for commercial operation under the contract.[50] The Tax Court in Consumers mischaracterized the holding in Madison Newspapers as implying that publishing newspapers on a regular basis had been a prerequisite for its finding that three units of a printing press were placed in service.[51] In truth, though, installation and readiness had been the controlling factors for the acquisition date in Madison Newspapers.

   b.   Oglethorpe Power Corp. v. Commissioner

In the only other Tax Court opinion involving the "placed in service" determination for an electric generating facility, Oglethorpe Power Corp. v. Commissioner[52], the Tax Court did look to

_____

[50]See Madison Newspapers, 47 T.C. at 637. The taxpayers in Madison Newspapers wanted a later date of acquisition because under the controlling statute at the time, the investment tax credit only applied to their property if it was acquired after December 31, 1961. See id. at 634.

[51]See Consumers, 89 T.C. at 723.

[52]60 T.C.M. (CCH) 850 (1990).

22

the Revenue Ruling factors for guidance.[53]  The Tax Court's analysis of the factors, however, was clearly influenced by its earlier insistence in Consumers on a facility's ability to sustain power generation near rated capacity before it could be deemed to have been placed in service.  The Tax Court held that the taxpayer's unit was placed in service in 1982, and not 1981 as the Commissioner had argued, because in 1982 the unit completed the testing required by the Georgia Public Service Commission.[54]  The Commission would not consider the unit for rate-making purposes unless it had completed testing.  Further, under the terms of the taxpayer's operating agreement with Georgia Power, which constructed the unit, the taxpayer would not have control or the right to income from the unit until it was declared to be in "commercial operation" after completion of testing.[55]

Even though the Oglethorpe unit had been synchronized and was producing power during test period operation in 1981, it was not in

---

[53]The Revenue Ruling factors as cited by the Tax Court are: 1) having obtained the necessary permits and licenses for operating; 2) having performed all critical tests necessary for proper operation; 3) placing the unit in the control of the taxpayer; 4) having synchronized the unit with the transmission grid; and 5) daily operation of the unit.  See id. at 860.  We discuss these factors' application to Sealy later in this opinion.

[54]See id. at 859, 864.  The property of the Oglethorpe plant was transferred in safe harbor leases, making the "placed in service" date a crucial issue.  The petitioner, Oglethorpe Power, wanted the later date because under Section 168(f)(8) of the Code, the property had to have been leased within three months after such property was placed in service to be deemed "qualified leased property."  See id. at 859.

[55]See id.

the control of the taxpayer, did not have the necessary permits, and was still undergoing testing.[56]  The Tax Court did not rest its opinion on the balance of these Revenue Ruling factors, however. Relying on Consumers, the court in Oglethorpe stated that the unit was not deemed to be placed in service in 1981 because it was not available for its specifically assigned function, which the court defined as consistently sustaining generation levels near its rated capacity.[57]

Adopting and extending its prior approaches in Oglethorpe and Consumers, the Tax Court in the instant case totally disregarded the Revenue Ruling factors and instead placed great weight on the purpose stated in Sealy's Certificate of Limited Partnership, i.e., that the facility was designed to generate 38,400 kilowatt hours of electricity per day.  The court noted that, because Sealy's facility only generated a small amount of electricity while it was operational, it did not fulfill its specifically assigned function of generating the projected amount of electricity and therefore was never placed in service.  This narrow interpretation of the "placed in service" standard contravenes the policy behind the investment

_____

[56]See id. at 855-57.

[57]See id. at 861.  We find interesting the fact that the Commissioner argued in Oglethorpe that the facility should be considered to have been placed in service in 1981, even though it had not completed testing then, because it met its specifically assigned function of producing electricity in that year and had been synchronized.  We agree with the Commissioner's then-unsuccessful argument in Oglethorpe that the Treasury Regulation would have no meaning if "operational" were defined as "functioning perfectly or near perfectly" and that the production of income is not necessary to find that a unit is placed in service.  See id. at 862-63.

24

tax credit and the applicable Regulation examples as well.

We conclude that the Tax Court erred in applying an unduly restrictive "placed in service" test that requires regular operation as measured by the amount generated. The appropriate method for determining the year that an electric generating facility is placed in service is to analyze a taxpayer's fact situation, using a common-sense approach in the context of the policy behind the investment tax credit, the Treasury Regulations defining "placed in service," and the Revenue Ruling factors. As we disagree with the Tax Court's interpretation of the legal standards defining when an asset is placed in service, our review of the "placed in service" determination for Sealy's facility is <u>de novo</u>.

### 3. The Meaning of "Placed in Service"

The legislative history related to the investment credit indicates that, contrary to the Tax Court's interpretation of the "placed in service" requirement, Congress did not intend to impose the stringent requirement of regular achievement of anticipated production levels when it created the credit. In addition, the Commissioner's own regulations interpreting the relevant statutory provisions support our interpretation of the phrase "placed in service." These regulations do not require that property entitled to depreciation and credits must first meet expected output goals before it may be deemed to have been placed in service[58]; to the

---

[58]Treasury Regulations 1.167(a)-11(e)(1)(i) and 1.46-3(d)(1)(ii) merely state property is placed in service when it is "placed in a condition or state of readiness and availability for

25

contrary, these regulations reveal that defectively or disappointingly performing property may still be considered to have been placed in service. For these reasons, we reject the Tax Court's narrow analyses of the "placed in service" determination in Oglethorpe and Consumers.

Congress enacted the investment tax credit to stimulate the economy by encouraging investment in machinery, equipment, and certain other property.[59] In the legislative history related to the Energy Tax Act of 1978, Congress stated that the purpose of the energy tax credit was to encourage taxpayers' expenditures towards the use of renewable, alternative energy sources.[60]

These credits provide an incentive to acquire property such as machinery and equipment by lowering the effective after-tax acquisition cost of the qualified property, which in turn increases the rate of return on these assets. The legislative history dealing with the investment tax credit noted that the increased cash flow would be particularly important for new and smaller firms, like Sealy, which did not have ready access to the capital

a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity."

[59]See S. Rep. No. 1881, 87th Cong., 2d Sess. 11 (1962), reprinted in 1962 U.S.C.C.A.N. 3297, 3304, 3313. See also Comdisco, Inc. v. United States, 756 F.2d 569, 572 (7th Cir. 1985)("legislative history . . . reveals the hope of Congress that the credit would stimulate economic growth by providing substantial incentive to undertake capital investment projects").

[60]S. Rep. No. 529, 95th Cong., 2d Sess. 1, 6-11 (1978), reprinted in 1978 U.S.C.C.A.N. 7942, 7945-49.

markets.[61]  The credit would lower the profit risk that these firms faced in starting out a new venture and therefore would facilitate their investment decisions.[62]

Courts have often recognized the notion that the "investment tax credit should be construed liberally in light of its purposes."[63]  The Tax Court's reading of "specifically assigned function" as achieving ideal or near ideal production levels, however, demands a hindsight approach to the success of a taxpayer's investment expenditures which undermines the very focus of the credits' incentive, the initial investment decision.

Further, the Commissioner's own interpretations of the statute in the relevant Regulations support a less restrictive examination of the contribution of property to the business for the "placed in service" determination.  This common-sense approach stops short of requiring a new business to achieve a certain level of production in order to qualify for the credit.  In defining "placed in service," Treasury Regulation 1.46-3(d)(1)(ii)[64] neither states nor implies that the property must produce an anticipated or projected amount before it may be considered ready and available

---

[61]See S. Rep. No. 1881, reprinted in 1962 U.S.C.C.A.N. at 3314.

[62]See id.

[63]See Morrison, Inc. v. Commissioner, 891 F.2d 857, 864 (11th Cir. 1990); Illinois Power Co. v. Commissioner, 792 F.2d 683, 685 (7th Cir. 1986); Illinois Cereal Mills, Inc. v. Commissioner, 789 F.2d 1234, 1239 (7th Cir. 1986), cert. den., 479 U.S. 995, 107 S.Ct. 600, 93 L.Ed.2d 600.

[64](1984).

for a specifically assigned function.  Neither do the examples in Treasury Regulation § 1.46--3(d)(2)(ii) and (iii)[65]SQillustrating when property acquired for use in a trade or business or for the production of income is placed in serviceSQsupport the Tax Court's unduly strict construction of the statute.

One Regulation example of property placed in service for a taxable year is operational farm equipment acquired during the taxable year but not used because it is not practicable to use such equipment for its specifically assigned function in the taxpayer's business of farming until the following year.[66]  This example does not imply that the farming operation has to produce crops at or near its expected level in order for the equipment to be placed in service.  To the contrary, this example contemplates that it may not be practicable to use some assets acquired for the farming business if the business' output does not present a need for the additional equipment at the present time.

Another Regulation example of property placed in service is equipment acquired for a specifically assigned function which is operational but is undergoing testing to eliminate any defects.[67] This example acknowledges that defective performanceSQpresumably performance below that which was anticipated or projectedSQdoes not

---

[65](1984)

[66]See Treas. Reg. §1.46-3(d)(2)(ii)(1984).

[67]See Treas. Reg. § 1.46-3(d)(2)(iii)(1984).

bar an asset's "placed in service" designation.[68]

## 4. The Sealy Facility Was Placed in Service in 1984

Our de novo review of the "placed in service" determination for Sealy's facility in light of the relevant legislative history, Treasury Regulations, and Revenue Rulings leads us to conclude that the facility was placed in service in 1984 for purposes of depreciation and the energy and investment tax credits.

### a. The Revenue Ruling Factors

The Commissioner has issued several Revenue Rulings dealing with the "placed in service" requirement for electric generating facilities and these have described five factors to be considered in determining whether property has been placed in service for purposes of depreciation and tax credits. As the factors have evolved from examining specific facts related to each ruling's particular facility, they are only indicative of "placed in service" or "operational" status and are not all necessary to a finding that a facility has been placed in service.[69] Unlike

---

[68]Rev. Rul. 76-428, 1976-2 C.B. 47, provides additional support for this approach. The electric generating unit in this ruling was deemed to have been placed in service in the year when "all equipment was performing its specifically assigned function, that is, operating as a unit even though equipment was still undergoing testing to eliminate any defects and to demonstrate reliability."

[69]See Rev. Rul. 84-85, 1984-1 C.B. 10 (stating that although another Revenue Ruling found taxpayer's facility had been placed in service when it was able to operate at rated capacity without failure, this level of operation was not prerequisite but merely fact demonstrative of operational status). See Oglethorpe Power Corp. v. Commissioner, 60 T.C.M. (CCH) 850, 860 (1990)(recognizing that "placed in service" determination

Treasury Regulations, Revenue Rulings do not have the presumptive force and effect of law but are merely persuasive as the Commissioner's official interpretation of statutory provisions.[70]

As noted earlier, the Revenue Ruling factors are:  1) whether the necessary permits and licenses for operation have been obtained; 2) whether critical preoperational testing has been completed; 3) whether the taxpayer has control of the facility; 4) whether the unit has been synchronized with the transmission grid; and 5) whether daily or regular operation has begun.[71]  Considering and balancing these factors as applied to the items of personal property in Sealy's facility convinces us that the facility did become "operational" and was placed in service, and that 1984 was the year in which that occurred.

### i.    Permits and Licenses

A review of the pertinent documents in the record, which the parties stipulated were authentic, reveals that by 1983 Sealy had obtained the necessary permits and licenses for operation of its electric generating facility.  The Texas Department of Health in 1982 authorized EAI to operate the facility as an energy recovery

---

requires consideration and balancing of all factors).

[70]See Foil v. Commissioner, 920 F.2d 1196, 1201 (5th Cir. 1990); Stubbs, Overbeck & Assocs., Inc. v. United States, 445 F.2d 1142, 1146-47 (5th Cir. 1971); Macey's Jewelry Corp. v. United States, 387 F.2d 70, 72 (5th Cir. 1967).

[71]See Rev. Rul. 84-85, 1984-1 C.B. 10; Rev. Rul. 79-203, 1979-2 C.B. 94; Rev. Rul. 79-98, 1979-1 C.B. 103; Rev. Rul. 79-40, 1979-1 C.B. 13; Rev. Rul. 76-428, 1976-2 C.B. 47; Rev. Rul. 76-256, 1976-2 C.B.46.

site.[72]  In 1983, the Texas Air Control Board notified EAI by letter that Sealy's facility would be exempt from its permit requirements because of the Board's determination that the incinerator would not make a significant contribution of air contaminants to the atmosphere.

### ii.    Critical Preoperational Testing

As for the second factor, Lileng, the EAI engineer who designed Sealy's facility, testified that no testing was necessary because the facility's components were ready-made parts that would function appropriately in the system if they were not defective. Lileng's testimony was not contradicted at trial.  In acquiring the components for Sealy's facility, EAI provided the manufacturers with the specific rating levels and capacities required for EAI's design.  Unlike the highly complex component systems in Revenue Ruling 76-256[73], therefore, the components used in the Sealy facility did not have to pass a critical testing stage before the facility could operate.  Similarly, Sealy's facility did not need to undergo a preoperational testing program as did the facility in Revenue Ruling 76-428.[74]

### iii. Control of the Facility

Sealy met the indicia of physical and legal control of the

---

[72]EAI constructed, managed, and operated the facility on behalf of Sealy under its management agreement with the partnership.

[73]1976-2 C.B. 46.

[74]1976-2 C.B. 47.

electric generating facility by 1984.[75]  In 1982, the partnership

entered into an agreement with the City for the site property and

the lease was signed at the end of 1983.  In 1983, Sealy acquired

the component parts and hired EAI to assemble them according to

EAI's design of the facility.  EAI completed construction of the

facility for Sealy in the same year.  Under Sealy's management

agreement with EAI, Sealy retained the risk of loss while EAI

constructed, managed and operated the facility on behalf of Sealy.

EAI was obligated to indemnify Sealy and hold it harmless from any

liabilities or obligations arising from the malfunction of the

facility due to EAI's gross negligence or willful misconduct.  The

agreement also specified that EAI would contract for insurance at

Sealy's expense, insuring Sealy and EAI for any loss or damage to

the facility, for products liability, and for general liability.

Sealy had title to the facility at all times and had the legal

right to enforce the warranties that EAI obtained from the

manufacturers of the equipment for the facility.  Sealy also

obtained a license for the use of EAI's patented high-pressure

---

[75]Rev. Rul. 76-428, 1976-2 C.B. 47, stated that the taxpayer met this "placed in service" factor because it had physical control of the unit as well as the legal attributes of ownership such as title, risk of loss, and liability.  In Rev. Rul. 79-98, 1979-1 C.B. 103, however, a taxpayer who had not yet formally accepted the unit from the contractor and therefore did not carry the risk of loss nevertheless qualified for the credit.  The taxpayer had title to the material and equipment incorporated in the unit and had agreed to obtain nuclear liability insurance, property insurance applicable to all nonnuclear occurrences, and an agreement of indemnification for public liability claims.  The contractor had agreed to maintain insurance for occurrences prior to unit acceptance involving its materials and equipment and the taxpayer's property.

vaporizing process.

### iv. Synchronization Into the HL&P Grid

Synchronization of an electric generating facility refers to the stage at which alternating current systems, generating units, or a combination thereof are connected and operate at the same frequency so that the voltages between the systems remain constant.[76] Some Revenue Rulings have used the date of a facility's synchronization as a "placed in service" indicator.[77] The Tax Court made no factual finding as to what year Sealy's facility was synchronized into the HL&P grid, and the trial testimony was conflicting as to this fourth Revenue Ruling factor. Lileng testified that Sealy's facility was connected to HL&P in 1983 to enable HL&P to monitor the electricity output and that there was no need for synchronization at the facility because, through the use of induction generators, it automatically mirrored the voltage and phase of HL&P. The "synchronization factor" would then be irrelevant here as the Sealy facility would be distinguishable from the facilities described in the Revenue Rulings which required synchronization as a prerequisite to generating electricity for another system.

Lileng's testimony was contradicted by that of IRS agent Leanna Cantu, who testified from notes taken when she interviewed

---

[76]See Oglethorpe Power Corp. v. Commissioner, 60 T.C.M. 850, 853 (1990).

[77]See Rev. Rul. 76-256, 1976-2 C.B. 46; Rev. Rul. 76-428, 1976-2 C.B. 47; Rev. Rul. 79-98, 1979-1 C.B. 103; Rev. Rul. 79-203, 1979-2 C.B. 94.

Sealy partner Donald Rutt as part of the IRS audit. Her notes reflected that, as of the date of the interview in 1985, the facility had not yet been synchronized into the HL&P grid. Rutt, however, testified that he had never used the term "synchronized" in his conversation with Agent Cantu.

As the Tax Court failed to make a factual finding on this point, we cannot on appeal make a factual finding in the first instance.[78] Even so, as we have stated previously, neither the presence nor absence of any one of the Revenue Ruling factors is dispositive of the "placed in service" determination. In the instant case, we find that the remaining Revenue Ruling factors plus additional factual circumstances relevant to the Sealy facility supply sufficient indicia of Sealy's operational status in 1984.

v.  Daily or Regular Operation of Facility

As for this final factor, the parties do not dispute that the electric generating operation was conducted regularly in 1984 even though its performance was sporadic and the volume of its output was disappointing. According to the undisputed testimony at trial, the power facility was run on a regular basis by several EAI employees. In addition to operating the landfill's gate and collecting tipping fees, these employees monitored the performance of the plant from the facility's control room, which contained a

---

[78]See Landry v. Air Line Pilots Ass'n Int'l AFL-CIO, 901 F.2d 404, 423 (5th Cir. 1990), cert. denied, 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990); Commonwealth Mortgage Corp. v. First Nationwide Bank, 873 F.2d 859, 869 (5th Cir. 1989), reh'g denied, 881 F.2d 1071 (5th Cir. 1989)(en banc).

computer and equipment for measuring pressure and temperature levels for the various components of the facility. The employees took notes on the plant's performance and copied them onto the computer printouts, creating daily reports of the facility's generating operations. Although it is not clear from the record whether the facility was operated on a daily basis, its operation on a regular basis suffices to demonstrate this aspect of the facility's "placed in service" status.[79]

b.    Legislative History and Regulations

The legislative history and Regulations indicate that it is sufficient for purposes of the "placed in service" test that Section 38 property be ready and available to play its role in an operating facility, regardless of the level of production attained. The goal of Sealy's plan was for the facility to generate electricity, and Sealy presented evidence that the facility did generate electricity, starting in 1984. The Tax Court's statement that it found no evidence to support Sealy's contention  that the facility was generating electricity in 1984 is clearly erroneous. Lileng testified that the facility generated electricity as early as 1984, even though the first readings from HL&P's records were in 1985. He explained that it was likely that the electricity output

---

[79]In Rev. Rul. 76-256, 1976-2 C.B. 46, daily operation of a generating unit was one indicator that it had been placed in service. Rev. Rul. 79-98, 1979-1 C.B. 103, stated that a "'state of readiness and availability for a specifically assigned function,' such as 'daily operation'" determined when a facility was placed in service. The more recent Rev. Rul. 84-85, 1984-1 C.B. 10, however, found that a facility operating on a regular basis had been placed in service even though it was experiencing operational problems.

in 1984 was not registered in HL&P's records because the amounts of electricity generated in that year were small. Further, Sealy entered into an agreement with HL&P in 1984 under which it would sell its electricity output to the power company. That the facility was unable to generate electricity at its rated capacity does not obviate the fact that it met its specifically assigned function of generating electricity.[80]

Moreover, the inability of Sealy's facility to achieve or sustain anticipated levels of production stemmed from the alleged malfeasance of the incinerator's manufacturer. The incinerator that it fabricated and delivered to Sealy turned out to have far less capacity than Sealy had specified in its order, crippling the effectiveness of a key component of the facility. Albeit unsuccessful, Sealy made a good-faith effort to correct the facility's operational problems by seeking out new investors to fund a replacement incinerator; and, in the end, the partnership's misfortunes caused by the faulty incinerator ultimately forced Sealy to declare bankruptcy. Its activities in acquiring and operating an electric generating facility and entering into an agreement with HL&P constituted the operation of a business even though the facility experienced insurmountable operational problems

---

[80]In Rev. Rul. 84-85, 1984-1 C.B. 10, the Commissioner stated that operating at rated capacity was not a prerequisite for a facility's operational status. This Revenue Ruling involved an electric generating facility, similar to Sealy's, which converted solid waste into steam energy. The facility was deemed "placed in service" when it first became operational even though it operated well below its rated capacity and was experiencing operational problems.

that prevented its ever achieving success.

In _Piggly Wiggly Southern, Inc. v. Commissioner_[81], the Tax Court held that refrigeration equipment acquired for new supermarkets was not placed in service until they were open for business, but that equipment for remodeled stores was placed in service when purchased. The distinction was based on the concept that property qualifying as "placed in service" had to be acquired for an existing trade or business.[82] Using _Piggly Wiggly_ as an analogue, we conclude that Sealy's electric generating facility was "open for business" in 1984: it was operating as a unit, it was generating electricity, and Sealy had completed the sale agreement with HL&P for its output. That Sealy's commercial enterprise made hardly any "sales" because of substantial functional difficulties with an essential component in the facility does not affect the determination that the facility as a whole was placed in service.[83]

As discussed previously, the energy and investment tax credits were designed to stimulate private investment in qualifying property by allowing taxpayers with environmentally desirable projects to implement them at a reduced cost. The partnership's

----

[81] 84 T.C. 739, 745 (1985), _aff'd_ 803 F.2d 1572 (11th Cir. 1986).

[82] _See_ _id._ at 745-48.

[83] As support for its "placed in service" argument, Sealy cites to _Piggly Wiggly_ and other "idle asset" cases in which courts have held that property not yet in use because of circumstances beyond the taxpayer's control may nevertheless be considered to have been placed in service. In light of our conclusion that the facility as a whole was operating in 1984, we need not address the applicability of these cases to Sealy's property.

attempt to create, through the purchase of various items of tangible personal property, a unique electric generating facility that would have the dual benefit to the community of processing and converting its solid waste into an alternative affordable energy source is the very type of activity Congress intended to encourage through the energy and investment tax credit statutes. Sealy's misfortune in acquiring an incinerator that failed to perform at the level of Sealy's specifications and the manufacturer's (mis?)representations does not preclude the designation of Sealy's property as having been placed in service in 1984, the first year in which the entire facility was operational and generating electricity, for purposes of depreciation deductions and the energy and investment tax credits.

D. PRE-OPERATING EXPENSE ISSUE

Having found that the property of Sealy's facility was placed in service in 1984, we turn to the issue raised by the Commissioner on cross-appeal. The Commissioner argues that the Tax Court erred in not considering the challenge to the deductibility, under Section 162[84], of certain of Sealy's expenses. Based on the procedural posture of the Commissioner's argument, we conclude that a remand to the Tax Court is necessary for a factual determination as to when Sealy was carrying on a trade or business for purposes of deducting expenses under § 162.

---

[84]Section 162(a) states that "[t]here shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."

The Tax Court's opinion stated that a decision would be entered under Rule 155 of the Tax Court Rules of Practice and Procedure.[85] The Commissioner then submitted a proposed decision document disallowing Sealy's expenses for local taxes, legal fees, accounting fees, interest, and various other items, based on the Commissioner's position that these expenses were nondeductible pre-operating expenses.[86] Sealy objected, arguing that the Commissioner's computation was inconsistent with the Tax Court's opinion and with the parties' Stipulation of Facts.

In response to the Commissioner's Motion for Entry of Decision, the Tax Court issued a post-computation Order stating that the Commissioner did not raise the issue of pre-opening expenses at the trial and thus was inappropriately "bootstrapping" the issue after the court's "placed in service" determination. It held that the Commissioner's argument in support of its proposed computation raised a new issue which the court would not consider at that late date.[87] Our review of the record, however, reveals that the Tax Court clearly erred in finding that the Commissioner

[85]Rule 155 provides that the Tax Court, after entering its opinion on the issues, may withhold entry of its decision to allow the parties to propose computations pursuant to the court's determination of the issues. See Paccar, Inc. v. Commissioner, 849 F.2d 393, 399 (9th Cir. 1988).

[86]The Commissioner, consistent with the Tax Court's opinion, also disallowed the depreciation deductions and credits in the proposed computation.

[87]The court in a post-trial proceeding may hear arguments regarding any disagreements between the parties as to the amount of the deficiency, but no argument is permitted as to any new issue. See Knowlton v. Commissioner, 791 F.2d 1506, 1511 & n.4 (11th Cir. 1986).

39

had not raised the pre-operating expense issue at trial.

In the FPAA sent to Sealy, the Commissioner listed the itemized expenses and stated that one of the reasons for the assessed deficiency was that Sealy had failed to substantiate that the amounts claimed "constitute[d] ordinary and necessary business expenses and were not capital in nature." This statement, although broadly worded and arguably vague in the context of the Commissioner's initial sham theory, was sufficient to have placed the taxpayer on notice that the pre-operating expense theory would possibly be one of the Commissioner's arguments at trial.[88]

The Commissioner's trial memorandum to the Tax Court further reveals that the issue was raised at trial. The memorandum explicitly states that one of the issues in dispute is "[w]hether, during any of the years in issue, the Partnership was conducting the trade or business for which it organized, or was engaged in pre-opening activities. I.R.C. §§ 195, 709." That memorandum also cited Richmond Television Corp. v. United States[89], a case recognized as the progenitor of the pre-operating expense doctrine

---

[88]See Abatti v. Commissioner, 644 F.2d 1385, 1389-90 (9th Cir. 1981)(stating that "if a deficiency notice is broadly worded and the Commissioner later advances a theory not inconsistent with that language, the theory does not constitute new matter"); Reese v. Commissioner, 615 F.2d 226, 233 (5th Cir. 1980)(finding that when the determination "is made in general and indefinite terms, the taxpayer is reasonably placed on notice that the basic elements of a claimed deduction, including its fact, amount and character, are in dispute").

[89]345 F.2d 901 (4th Cir. 1965), vacated on other grounds, 382 U.S. 68, 86 S.Ct. 233, 15 L.Ed. 2d 143 (1965)(per curiam).

40

under Section 162.[90]

Moreover, Sealy acknowledged the pre-operating expense issue in its own trial memorandum, stating that the issues included "[w]hether petitioner was engaged in a trade or business and/or an activity engaged in for profit during 1983 and 1984" and "[w]hether the amounts claimed by Petitioner in 1983 and 1984 constitute ordinary and necessary business expenses or were . . . capital in nature."  Sealy's trial memorandum also asserted that Sealy had properly classified its expenditures as ordinary or capital.

Finally, the record reveals that the Commissioner's opening argument at trial noted the pre-operating expense theory as an issue.[91]  In light of the foregoing, we find that the court erred in stating that the Commissioner failed to raise the expense issue at trial and conclude that the Tax Court should have reached the factual issue whether Sealy's expenses were incurred while engaged in a trade or business.

Although the facts considered for both the "placed in service" issue and the pre-operating expense issue substantially overlap,

---

[90]See Fishman v. Commissioner, 837 F.2d 309, 312 (7th Cir. 1988), cert. denied 487 U.S. 1235, 108 S.Ct. 2902, 101 L.Ed.2d 935 (1988); Johnsen v. Commissioner, 794 F.2d 1157, 1160 (6th Cir. 1986).

[91]The Commissioner's opening argument stated that "the operating expenses were disallowed under [a] pre-opening expense theory" and that the second major issue, in addition to the "placed in service" issue, was "whether during any of the years at issue the partnership was conducting a trade or business for which it was organized before being engaged in pre-opening activities."  The Commissioner also told the court that the determination of this issue "mainly affect[ed] the deductibility of claimed operating expenses."

the issues call for separate determinations under different sections of the Internal Revenue Code. The Tax Court recognized the discreteness of the two issues in its post-computation Order when it rejected the Commissioner's proposed disallowance of Sealy's expenses under the pre-operating expense theory. As we cannot make such a factual finding in the first instance, and the Tax Court failed to address whether Sealy was engaged in a trade or business when it incurred the challenged expenses, we must remand this issue to the Tax Court.

In doing so, however, we note that the facts available to us in the record to date strongly militate in favor of a finding that Sealy was engaged in a trade or business sometime in 1983.[92] The record shows that in that year, Sealy operated the landfill, accepted tipping fees for waste disposal, leased the property on which it built and operated the facility, obtained the necessary permits and licenses for operating the facility, completed construction of the facility, and operated the incinerator. In light of cases addressing the question whether a taxpayer is engaged in a trade or business, these facts seem sufficient to support a finding that Sealy was not engaged in pre-opening activity in late 1983, but instead was carrying on a trade or

---

[92]In Commissioner v. Lincoln Savs. & Loan Assoc., 403 U.S. 345, 32, 91 S.Ct. 1893, 1898, 29 L.Ed.2d 519,        (1971), the Supreme Court stated that "[t]o qualify as an allowable deduction under Section 162(a) . . . an item must (1) be 'paid or incurred during the taxable year,' (2) be for 'carrying on any trade or business,' (3) be an 'expense,' (4) be a 'necessary' expense, and (5) be an 'ordinary' expense." The second requirement is at issue in the instant case.

business.[93]  Further, the parties stipulated that Sealy had a valid

business purpose and had never been a sham, satisfying the

threshold "profit motive" requirement of Section 162.[94]  On remand

the Tax Court must determine when Sealy's start-up period ceased

and its activity of operating a trade or business began, and must

then examine each of the disallowed expenses to determine whether

any are capital in nature.[95]  As stated previously, we leave the

---

[93]See Aboussie v. United States, 779 F.2d 424, 428 (8th Cir.
1985)(affirming district court's finding that partnership was not
carrying on a business until its housing project was
substantially ready for rental); Blitzer v. United States, 684
F.2d 874, 880-81, 231 Ct.Cl. 236,    (Cl. Ct. 1982)(per
curiam)(corporation may be considered to be engaging in business
when it begins business operations even if income production has
not begun); Richmond Television Corp. v. United States, 345 F.2d
901, 905 (4th Cir. 1965)(television station not carrying on trade
or business because had not yet obtained license or begun
broadcasting), vacated on other grounds, 382 U.S. 68, 86 S.Ct.
233, 15 L.Ed.2d 143 (1965)(per curiam).

[94]See Commissioner v. Groetzinger, 480 U.S. 23, 35, 107
S.Ct. 980, 987, 94 L.Ed.2d 25,    (1987)("we accept the fact
that to be engaged in a trade or business, the taxpayer must be
involved in the activity with continuity and regularity and that
the taxpayer's primary purpose for engaging in the activity must
be for income or profit"); Hayden v. Commissioner, 889 F.2d 1548,
1552 (6th Cir. 1989); Brannen v. Commissioner, 722 F.2d 695, 704
(11th Cir. 1984); Cooper v. Commissioner, 88 T.C. 84, 108-109
(1987).

[95]See Lincoln Savs. & Loan Assoc., 403 U.S. at 354, 91 S.Ct.
at 1899, 29 L.Ed.2d at    (controlling feature of capital
payment is that it serves to create or enhance separate and
distinct additional asset); Fishman v. Commissioner, 837 F.2d
309, 312 (7th Cir. 1988)(expenses incurred before taxpayer's
trade or business begins to operate are not deductible); El Paso
Co. v. United States, 694 F.2d 703, 714 (Fed. Cir.
1982)(recognizing that § 162 deduction may be available to
corporation not yet carrying on revenue producing operations);
Blitzer, 684 F.2d at 880 (expenses before start of revenue
producing operations deductible under § 162 if not "in the nature
of start-up costs nor intended to provide benefits extending
beyond the year in question").

task of fact-finding to the Tax Court given its failure to address the pre-operating expense issue when the Commissioner raised it at trial.

III

CONCLUSION

For the foregoing reasons, we reverse the Tax Court's finding regarding the "placed in service" determination and hold that, for purposes of depreciation and the energy and investment tax credits, the property in Sealy's electric generating facility was placed in service in 1984. Accordingly, we remand the case to the Tax Court for a calculation of Sealy's tax liability for 1983 and 1984 not inconsistent with this opinion. We also remand for a finding as to when Sealy was carrying on a trade or business for purposes of deducting its expenses under § 162. Finally, we affirm the Tax Court's ruling on the FPAA issue.